DEFENDANT'S
EXHIBIT
A

## STATE OF VERMONT

**SUPERIOR COURT**                                         Civil

**Chittenden**        **Unit**                    Case No. <u>24-CV-00482</u>

| Plaintiff(s) | VS. | Defendant(s) |
|---|---|---|
| Kimberly Marcoux | | Christina Wettstein |

## SUMMONS

THIS SUMMONS IS DIRECTED TO <u>Christina Wettstein</u>

1. **YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights.

2. **YOU MUST REPLY WITHIN 21\* DAYS TO PROTECT YOUR RIGHTS**. You must give or mail the Plaintiff **a written response** called an Answer within 21\* days of the date on which you received this Summons. You must send a copy of your Answer to the [Plaintiff][Plaintiff's attorney] located
at: <u>Jeremy S. Grant 30 Main Street, Suite 500, P.O. Box 1489</u>
<u>Burlington, Vermont 05402-1489</u>

   You must also give or mail your Answer to the Court located at:
<u>Vermont Superior Court--Chittenden Civil Division</u>
<u>175 Main Street, Burlington, VT 05401</u>

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT GIVE YOUR WRITTEN ANSWER TO THE COURT.** If you do not Answer within 21\* days and file it with the Court, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint.

5. **YOU MUST MAKE ANY CLAIMS AGAINST THE PLAINTIFF IN YOUR REPLY.** Your Answer must state any related legal claims you have against the Plaintiff. Your claims against the Plaintiff are called Counterclaims. If you do not make your Counterclaims in writing in your Answer, you may not be able to bring them up at all. Even if you have insurance and the insurance company will defend you, you must still file any Counterclaims you may have.

6. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you cannot afford a lawyer, you should ask the court clerk for information about places where you can get free legal help. **Even if you cannot get legal help, you must still give the Court a written Answer to protect your rights or you may lose the case.**

7. **NOTICE OF APPEARANCE FORM.** THE COURT NEEDS TO KNOW HOW TO REACH YOU SO THAT YOU WILL BE INFORMED OF ALL MATTERS RELATING TO YOUR CASE. If you have not hired an attorney and are representing yourself, in addition to filing the required answer it is important that you file the Notice of Appearance form attached to this summons, to give the court your name, mailing address and phone number (and email address, if you have one). You must also mail or deliver a copy of the form to the lawyer or party who sent you this paperwork, so that you will receive copies of anything else they file with the court.

/s/ Jeremy S. Grant, Esq.

*Plaintiff's Attorney/Court Clerk*

February 7, 2024

*Dated*

Served on

*Date*

*Sheriff*

\* Use 21 days, except that in the exceptional situations where a different time is allowed by the court in which to answer, the different time should be inserted.

# STATE OF VERMONT

**SUPERIOR COURT**                          Civil        **DIVISION**

Chittenden        **Unit**                    Case No. <u>24-CV-00482</u>

| *Plaintiff(s)* | VS. | *Defendant(s)* |
|---|---|---|
| **Kimberly Marcoux** | | **Christina Wettstein** |

## NOTICE OF APPEARANCE FOR SELF-REPRESENTED PARTY

My Name is: (print name) _____

In this case I am the: ☐ Plaintiff   ☐ Defendant   ☐ Other _____

I do not have an attorney and will represent myself. If I decide to be represented by an attorney in the future, my attorney will notify the court of the change.

In representing myself, I understand that I **MUST**:

1. **Notify the court in writing of any changes in my mailing address, phone number, or email address.**
2. **Give or send copies of any papers I file with the court to every other party in this case. If another party has an attorney, I will give or send copies to that party's attorney.**
3. **File a certificate of service with the court certifying that I have sent the papers I am filing (including this form) to all parties. I understand that I can find that form on the Vermont Judiciary website https://www.vermontjudiciary.org/ or at the courthouse.**

**Court Notices and Orders**
I understand that the court will send all notices and orders to me at the mailing address provided below.

**Documents from Other Parties in the Case**
I understand that the other parties in the case are required to provide me with a copy of all documents they file with the court.  If I consent, the other parties may send me documents by email instead of by mail.
I consent to receive documents from the other parties at the email provided below:
☐ YES   ☐ NO

My Mailing Address:

Address: _____

Town/City: _____  State: _____  Zip: _____

Phone Number (day): _____

Email Address: _____

Date

_____        _____
                                          Signature

# STATE OF VERMONT

**SUPERIOR COURT**
**Chittenden    Unit**

**CIVIL DIVISION**
**Case No.**  24-CV-00482

| Plaintiff | | Defendant |
|---|---|---|
| **Kimberly Marcoux** | **vs.** | **Christina Wettstein** |

## NOTICE OF LAWSUIT & REQUEST FOR WAIVER OF SERVICE OF SUMMONS

To:  Evan Barquist, Esq.
*(Name of Unrepresented Defendant or Defendant's Attorney)*

I (or my client) have started a lawsuit against you. I enclose a copy of the **Complaint,** a blank **Answer** form, two copies of the **Waiver of Service of Summons** form, and a blank **Notice of Appearance** form.

This is not a formal summons or notification from the Court. To save the cost of having a sheriff or constable deliver these papers to you, I am asking you to **sign and date** the Waiver of Service form and return it to me in the enclosed addressed & stamped envelope or email it to me at  jgrant@primmer.com                .
Keep the other Waiver of Service form and Complaint.

If you return the signed and dated Waiver of Service of Summons form by  March 12,2025   (date must be at least 30 days from the day this request was sent to you, if sent within the United States; at least 42 days if sent outside the United States), you will not have to pay to have the sheriff or constable deliver the summons. I will send your Waiver of Service form to the Court and the lawsuit will move forward. You will not be able to object to how this lawsuit was served on you, but you can still defend yourself and make counterclaims.

**If you return the Waiver of Service of Summons form by  March 12,2025   , then you must provide me and the Court a written response (Answer) to the Complaint (including any counterclaims), as required by the Vermont Rules of Civil Procedure (see e.g. Rules 8, 12 and 13) within 60 days of the date I sent you this Waiver form (90 days if the form was sent outside the United States). IF YOU DO NOT MEET THIS DEADLINE, THE COURT MAY DECIDE THE CASE AGAINST YOU.** Please review the attached **Important Information for Defendants.** You should also fill out the **Notice of Appearance** form and send it with your written response to the Complaint.

**If you do not return the signed and dated Waiver of Service of Summons form by  March 12,2025   , I will ask a sheriff or constable to serve you with a summons and I will ask the Court to require you to pay the costs.**

I affirm that this request is being sent to you on  February 10,2025   .

Date:  February 10,2025

Signature  /s/ Jeremy S. Grant, Esq.

Printed Name  Jeremy S. Grant

Phone Number  802-864-0880

Mailing Address
Primmer, Piper, Eggleston & Cramer P.C.
30 Main Street, Suite 500
Burlington , VT 05401

Email Address  jgrant@primmer.com

## IMPORTANT INFORMATION FOR DEFENDANTS

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached. Do not throw these papers away. They are official papers that affect your rights.

2. **YOU MUST RESPOND WITHIN THE TIME FRAMES SET OUT IN THE NOTICE OF LAWSUIT & REQUEST FOR WAIVER OF SERVICE OF SUMMONS TO PROTECT YOUR RIGHTS.** See time frames set out in the Notice of Lawsuit & Request for Waiver of Service of Summons sent to you with this Information for Defendants form.

3. **YOU MUST RESPOND TO EACH CLAIM.** Your written response to the Plaintiff's Complaint must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your written response (also known as your Answer).

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT GIVE YOUR WRITTEN ANSWER TO THE COURT.** If you do not send your written response (Answer) to the Court within the time frame set out in the Notice of Lawsuit & Request for Waiver of Service of Summons, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the Complaint.

5. **YOU MUST MAKE ANY CLAIMS AGAINST THE PLAINTIFF IN YOUR RESPONSE.** Your Answer must state any related legal claims you have against the Plaintiff. Your claims against the Plaintiff are called Counterclaims. If you do not make your Counterclaims in writing in your Answer, you may not be able to bring them up at all. Even if you have insurance and the insurance company will defend you, you must still file any Counterclaims you may have. You must pay a fee to file a counterclaim.

6. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you cannot afford a lawyer, you should ask the court clerk for information about places where you can get free legal help. **Even if you cannot get legal help, you must still give the Court a written Answer to protect your rights or you may lose the case.**

7. **NOTICE OF APPEARANCE FORM.** THE COURT NEEDS TO KNOW HOW TO REACH YOU SO THAT YOU WILL BE INFORMED OF ALL MATTERS RELATING TO YOUR CASE. If you have not hired an attorney and are representing yourself, in addition to filing the required Answer it is important that you file the attached Notice of Appearance form, to give the court your name, mailing address and phone number (and email address, if you have one). You must also mail or deliver a copy of the form to the lawyer or party who sent you this paperwork, so that you will receive copies of anything else they file with the court.

STATE OF VERMONT

SUPERIOR COURT                                     CIVIL DIVISION
Chittenden Unit                                    Docket No.:

KIMBERLY MARCOUX,                          )
                                           )
            Plaintiff,                     )
                                           )
      v.                                   )
                                           )
CHRISTINA WETTSTEIN,                       )
                                           )
            Defendant.                     )

## COMPLAINT

By and through her attorneys, Primmer Piper Eggleston & Cramer PC, Plaintiff Kimberly

Marcoux ("Plaintiff" or "Marcoux") alleges as follows:

### Parties and Entities

1.      Plaintiff Kimberly Marcoux is a resident of Essex Junction, Vermont.

2.      Defendant Christina Wettstein ("Defendant" or "Wettstein") is a resident of San

Antonio, Texas.

3.      Marcoux and Wettstein are 50-50 joint owners of two companies.

4.      The first company is Coterie White LLC ("CW"), a Vermont Domestic Limited

Liability Company.

5.      The second company is Melange de Blanc LLC ("MDB"), a Vermont Domestic

Limited Liability Company.

### Factual Background

6.      CW and MDB (collectively, CW and MDB hereinafter referred to as the

"Companies") were initially incorporated in the State of North Carolina.

1

7.      CW was initially incorporated on January 3, 2019 and MDB was incorporated on January 21, 2021.

8.      MDB has no operating agreement.

9.      CW has an operating agreement, attached hereto as **Exhibit 1**, which is neither signed nor dated.

10.     Nevertheless, both Wettstein and Marcoux acknowledged that the operating agreement for CW, although not signed, was effective, and they acted in accordance with that understanding.

11.     On or about July of 2022, after Wettstein moved from North Carolina to San Antonio, Texas, Wettstein and Marcoux chose to move CW and MDB to Vermont, where Marcoux resided because Wettstein's spouse was in the military and she may need to move again in the future.

12.     On September 13, 2022, CW was incorporated in Vermont as a Vermont Domestic Limited Liability Company.  *See* **Exhibit 2**, a true and accurate copy of the State of Vermont Office of Secretary of State Articles of Organization granted to Coterie White LLC.

13.     On September 19, 2022, MDB was incorporated in Vermont as a Vermont Domestic Limited Liability Company.  *See* **Exhibit 3**, a true and accurate copy of the State of Vermont Office of Secretary of State Articles of Organization granted to Melange de Blanc LLC.

Beginnings

14.     Marcoux and Wettstein first met in 2013, when Marcoux was working as a sales representative for the brand Monique Lhuillier and Wettstein was working at two different stores, Maddison Row and L'Atelier Couture.

15.     Marcoux and Wettstein built a rapport and became friends between 2015 and 2018.

16.     Marcoux recognized the need for a sales agency like CW while traveling for trunk shows and seeing brands she previously represented in bridal wholesale.  Marcoux realized CW could sell multiple brands at once.

17.     In addition, prior to creating CW, designers repeatedly asked Marcoux and/or Wettstein to represent them on the side, but at the time Marcoux and Wettstein were prevented from doing so because at the time they were employed under agreements that were exclusive.

18.     Accordingly, once their contractual obligations expired in 2018, Wettstein and Marcoux created CW as a bridal sales agency that could represent multiple bridal brands.

19.     Marcoux and Wettstein agreed to a 50-50 partnership and obtained an operating agreement that was never signed.  *See* **Exhibit 1**.

20.     CW works with designers/brands to provide comprehensive services, handling everything from strategic selling, customer service, order entry, billing, and distribution so that designers/brands had the freedom to focus on what they love – design – while leaving the other details to CW.

21.     CW also provides their clients brand development, brand forecasting, and general business consulting and is responsible for getting designer-clients placed in retail stores around the world.

22.     CW streamlines the buying process for retailers, making it easy for them to shop different designers, customize gowns and track inventory and shipments.

23.     As a sales agency, CW hires employees to serve as representatives for each designer that signed with CW.

24.     CW grew organically until 2020, when COVID-19 became a global pandemic and significantly restricted public gatherings.

25.     In 2020, Wettstein and Marcoux recognized that there was a market need for a new type of bridal tradeshow while COVID-19 closed down public spaces and other market organizers were unable to travel.

26.     In 2020, Wettstein and Marcoux launched their own pop-up bridal markets in response to requests from designers and retailers.

27.     These pop-up bridal markets became a large luxury trade show (known as "markets" in the bridal industry) for international and domestic designers to show their gowns so that retail buyers from all over the world could see and purchase gowns in person.

28.     The markets brought together buyers and select designers/brands for an in-person event where designers/brands could show off their newest collections and buyers could decide whether they wanted to sell each brand at their retail stores.

29.     Marcoux and Wettstein named these pop-up markets Melange de Blanc, which was registered as its own Limited Liability Company.

30.     MDB operates markets during the semi-annual bridal fashion weeks held in April and October of each year on 5th Avenue in New York City, New York.

31.     MDB also occasionally operates markets at other locations as well, including Palm Springs, Palm Beach, Atlanta, Las Vegas, Scottsdale and Milan, Italy.

32.     MDB and CW both continued to grow each year after 2020 and received very positive industry recognition.

33.     MDB and CW were featured in Forbes, Women's Wear Daily, and other notable bridal publications.

34.     MDB has also been approached and been in conversations to be acquired by various competing companies that recognize the value of the company.

35.    MDB has also been approached to partner with international markets to expand its reach.

36.    CW grew to have 10 employees, had $5 million in sales in 2023 and was projected to hit between $10-12 million in sales by the end of 2024.

37.    However, due to Wettstein's actions, CW only grossed 40% of its projected sales in 2024.

38.    Initially, Marcoux and Wettstein did everything together for the Companies, but they soon began to specialize after recognizing that it was not efficient.

39.    Marcoux and Wettstein both represented designers, held production calls, billing, customer service, and worked closely with their team members to train them and help build their target lists.

40.    Marcoux traditionally managed all quarterly training calls, shipping for international factory brands, all the company contracts, and ad hoc challenges/concerns as they came up.

41.    Wettstein focused more on the big picture and had a larger role in Melange de Blanc while Marcoux did more of the day-to-day tasks, especially in shipping and distribution.

42.    While both parties contributed to the overall growth of the Companies, Wettstein began to feel that the designers she represented and the team members she worked closely with, as well as Melange de Blanc (the trade show), 'belonged' to her rather than to Coterie White.

<u>Plans for Expansion</u>

43.    Starting in early 2022, Wettstein and Marcoux began forming plans to take CW and MDB global after receiving requests from designers to expand CW and MDB into different markets.

44.     Things were going so well that Marcoux and Wettstein discussed creating a new entity, Coterie White Europe ("CW EU") that was intended to provide the same services that CW provided in the United States to Europe.

45.     In other words, CW EU was created by Marcoux and Wettstein to do what the USA entity did but for designers and retailers based in the European Union ("EU").

46.     Designers informed Wettstein and Marcoux that they needed the CW structure in other territories as their other international sales representatives did not perform as well as CW and/or offer as many services.

47.     Marcoux and Wettstein had experience working with designers based in other countries.

48.     In 2021, CW began representing two collections, Libelle and Herve Paris, for Global Bridal House (GBS), a company based in Europe.

49.     At the end of 2022 or the beginning of 2023, GBS asked CW to represent another one of their collections, Modeca, and invited Wettstein, Marcoux and a team member, Shelley Weiner, to Amsterdam in February of 2023 for training at their annual sales summit with sales representatives and retail buyers from all over the world to review, learn about, and buy the newest collections.

50.     At the training, Wettstein and Marcoux met Lize Erasmus ("L. Erasmus") along with her husband Nic Erasmus ("N. Erasmus").

51.     In April of 2023, Marcoux and Wettstein visited the Barcelona Bridal market where they decided to solidify their future plans to expand CW and MDB beyond the United States.

52.     At that time, L. Erasmus, N. Erasmus, and Peter Dierckx (the owner of a design house) expressed that they wanted to be part of Coterie White and be involved in the Coterie White Europe entity, which would provide the same services CW provided but for the European market.

53.     In November of 2023, Marcoux, Wettstein, and L. Erasmus traveled to Paris for a "Summit."

54.     At the Paris Summit, L. Erasmus and two employees, Lauren Walsh and Aneta Okto, were trained on CW's B2B Wave Portal and the Companies' systems and processes.

55.     Marcoux expressed her concern to Wettstein that the Companies were handing over such important and sensitive information about their operations without contracts or non-disclosure agreements.

56.     Wettstein brushed off Marcoux's concerns.

<u>Marcoux's Injury</u>

57.     On December 22, 2023, Marcoux was seriously injured in a hit and run collision.

58.     As a result of the accident, Marcoux had a concussion and was diagnosed with a traumatic brain injury.

59.     Marcoux was instructed to take a break from work for the weekend to rest her eyes because she was experiencing periodic vision loss and severe/debilitating headaches.

60.     Marcoux returned to work the next Tuesday, December 26, 2023, and on a work Zoom conference call Marcoux became very ill due to the movement on this Zoom call and was sent to the hospital for further evaluation.

61.     Following her evaluation, Marcoux's medical team instructed her to take more time off.

62.     As a result, Marcoux and Wettstein agreed that Marcoux would take a medical leave for January and the beginning of February.

63.     While on leave, Marcoux and Wettstein's relationship began to fall apart as Wettstein began to demand that Marcoux inform her a date she could return to work, which Marcoux's medical team could not provide because brain injuries, such as the one Marcoux received, are unpredictable.

64.     Even though she was on leave, Wettstein would routinely yell at Marcoux for not working or contributing, which added to Marcoux's anxiety and left her in tears.

65.     As a result, Marcoux felt pressured to work to appease Wettstein, against her medical team's recommendation, and Marcoux was not able to truly rest or recover.

66.     Marcoux sought counseling in an effort to manage the relationship and the anxiety caused by Wettstein's constant berating, even through her medical leave, and Marcoux was even prescribed anti-anxiety medicine to deal with Wettstein's hostile behavior.

67.     Marcoux felt the only way she could avoid Wettstein's verbal attacks was to work, so Marcoux was emailing, texting, calling stores and team members and she was also doing quality control and shipment of gowns, even though she was instructed not to by her medical team.

68.     Although Marcoux was supposed to remain on medical leave through the beginning of February 2024, because there was no one else to handle logistics such as dress shipments at their VT headquarters, Marcoux started working part time.

69.     In April of 2024, Marcoux traveled to MDB's Market as both an owner of MDB and CW and as a representative for CW's designers.

70.     Because MDB's markets are important trade shows, they are typically located in buildings with very bright lights.

8

71.     As a result of her brain injury, Marcoux is very sensitive to light.

72.     Marcoux left the April 2024 MDB Market very sick due to the bright lights. She experienced vomiting, vision loss, and headaches.

73.     When Marcoux returned home from the MDB Market, she continued to experience intermittent vision loss, migraines and other symptoms.

74.     Her medical team evaluated her again and instructed her to take a complete rest for May and June, explaining that it was necessary for her recovery since she did not take a real break during her first medical leave.

75.     Terrified, on or around the beginning of May of 2024, Marcoux called Wettstein knowing she would be angry about the doctor's recommendation. After a very emotional call, Wettstein agreed that Marcoux would be provided up to three months' of leave.

76.     Marcoux took her leave during May and only occasionally answered text messages when they were urgent.

77.     In June, Wettstein unilaterally decided, without Marcoux's input or consent, to remove Marcoux from the mid-month payroll for the June 16-30 pay period.

78.     During Marcoux's June check-in call with Wettstein, Wettstein informed her that she could no longer afford paying Marcoux and would no longer pay Marcoux because she was on medical leave and not contributing to the Companies.

79.     At the same time, however, Wettstein began to pay herself large commission checks, even though Wettstein and Marcoux had agreed not to take commissions until after they had paid off a loan.

80.     Although Wettstein was responsible for making payments to team members for commissions and salaries, Wettstein failed to pay Marcoux any commissions that she earned until after Marcoux returned from medical leave on or about July 1, 2024.

81.     In June of 2024, Marcoux and Wettstein spoke to check in and during that call Marcoux explained to Wettstein that her doctors wanted her to ease back into work slowly.

82.     During and after that call, Wettstein's demands to buy out Marcoux's interest in the Companies began to escalate and Wettstein continued to demand to buy out Marcoux's interest when she went on medical leave.

83.     On that call, Marcoux also informed Wettstein that her first official day back after her medical leave would be July 1, 2024.

84.     Upon information and belief, while Marcoux was out on medical leave, Wettstein repeatedly and intentionally shared Marcoux's medical information with employees of the Companies and with the Companies' customers in an effort to make Marcoux look bad.

85.     For example, Wettstein informed one of CW's clients, Steve Lang, that Marcoux would not be able to work effectively upon her return from medical leave, which was a false statement.

Marcoux's Return

86.     When Marcoux spoke to Wettstein to explain she was ready to start easing back into work, Marcoux offered to move to Texas to be closer to Wettstein so that they could work in close proximity and improve their partnership, which they had been in talks about since the Paris trip.

87.     In response, Wettstein yelled at Marcoux, asserting that Marcoux was not needed anymore, she was too late, and that Wettstein had already built a team, so she should not move to Texas for her.

88.     In fact, Wettstein told Marcoux that enough was enough and it was time for them to go their separate ways, demanding that Marcoux sell her share of the Companies within days, even though she lacked information to make an informed decision since Wettstein did not keep Marcoux informed about the Companies' business or finances.

89.     At that time, Marcoux and Wettstein often had altercations that would blow over quickly, so Marcoux did not take Wettstein seriously and began to prepare to return to work.

90.     Marcoux began emailing and texting CW and MDB employees to alert them she would be returning and to ask for updates, passwords and other information so she could transition back into her role as smoothly as possible.

91.     The employees that Marcoux contacted did not properly respond to her requests.

92.     While Marcoux was on medical leave, Wettstein hired new staff and team members but did not bother to introduce them to Marcoux, and she never sought or obtained Marcoux's approval or consent to hire new staff.

93.     Upon her return, Marcoux noticed that staff were under the impression that Marcoux was not an authority in the Companies and that their only boss was Wettstein.

94.     This dynamic made it extremely difficult for Marcoux to task employees as necessary for various projects or initiatives and undermined Marcoux's ability to effectively manage the Companies.

95.     Upon information and belief, Wettstein intentionally created this dynamic to further her efforts to end her partnership with Marcoux so that she could appropriate the CW EU opportunity all for herself.

96.     Wettstein told Marcoux that the team members claimed she was making them uncomfortable and Wettstein then refused to answer or respond to a large number of Marcoux's questions, meeting requests, and password or one time pin (OTP) requests and emails.

97.     Upon information and belief, Wettstein instructed employees to make Marcoux's return difficult, as Marcoux had a good relationship with the employees up until that time.

Wettstein's Efforts to Hide Coterie White Europe from Marcoux

98.     At some point during or before Marcoux's medical leave, Wettstein decided to pursue the Coterie White Europe idea without Marcoux, using resources, funds, employees and contractors that worked for and were paid by the Companies, all without Marcoux's knowledge, consent or approval.

99.     For example, Wettstein brought L. Erasmus on board to effectively replace Marcoux as her partner, without any notice or discussion and without Marcoux's approval or consent.  For example, attached hereto as **Exhibit 4** is an email from Wettstein to an employee dated May 30, 2024, explaining that L. Erasmus was not just involved in CW EU, but she would eventually join Wettstein to oversee both USA and Europe operations.

100.     Wettstein never disclosed whether or if L. Erasmus was officially hired, her role, or how she was paid.  Accordingly, Marcoux expressed to Wettstein her discomfort in L. Erasmus's role while in Paris and never agreed or consented to L. Erasmus's role.

101.     While Marcoux was on medical leave, Wettstein provided L. Erasmus, N. Erasmus, and P. Dierckx (as well as his son Dylan Dierckx), with unrestricted access to all of CW and

12

MDB's intellectual property, confidential information, company files, the B2B portal, the Google drive, which is used as a company-wide information storage system, and other systems and processes of the Companies without any NDA's in place and without Marcoux's knowledge, consent or approval.

102.    Wettstein posted on the CW Instagram account about a partnership with L. Erasmus and the launch of CW EU, using CW copyright protected images without Marcoux's consent or approval, even though there was no contract between L. Erasmus and the Companies, as well as an email blast to all of CW's client base.

103.    When Marcoux expressed concerns about L. Erasmus and being excluded from discussions regarding CW EU, Wettstein explained that there was no written contract with L. Erasmus, so she had nothing to worry about.

104.    Although Wettstein initially included Marcoux in discussions about CW EU, after Marcoux returned from medical leave and asked about the CW EU portal, Wettstein falsely informed Marcoux that she was not pursuing CW EU and nothing was happening with that idea because she did not want to "deal with" Marcoux's alleged drama.

105.    Marcoux continued to feel uneasy about the CW EU conversations and events that were transpiring so she asked the Companies' lawyer if she should do anything and the Companies' lawyer told her that no contracts had been drafted at Wettstein's insistence, and that if either of the Companies expanded into Europe, Marcoux would be a beneficiary and they would create an operating agreement.

106.    At the same time Wettstein never informed Marcoux about all the CW EU plans in an effort to exclude Marcoux, Wettstein continued to use the Companies' resources, intellectual property, employees, contractors, and funds to create a new entity, Voeux Blancs ("VB" or the

"VB Project"), to pursue the CW EU plan, appropriating a corporate opportunity from the Companies without Marcoux's consent or knowledge.

107. Wettstein attempted to conceal these actions from Marcoux and was successful for a period of time.

108. For example, Wettstein and others involved in the VB Project repeatedly stated, using their CW email accounts, that those involved should not inform Marcoux of their plans and, on one occasion, L. Erasmus stated that she was taking funds out of Coterie White EU's bank account and Wettstein consented, without Marcoux's knowledge, consent or approval.

109. However, Wettstein and those working with Wettstein on the CW EU/VB Project made a fatal and amateur mistake – they used their CW email accounts to occasionally discuss their plans to create a new entity to compete with the Companies and to steal the Companies' confidential information and trade secrets.

110. For example, Wettstein, L. Erasmus and others used their CW email accounts to set up a CW EU PayPal account, develop a CW EU business plan, which, upon information and belief, was later adopted or used by VB, and otherwise create plans, processes and procedures for CW EU/VB, appropriating what they could from the Companies to obtain a competitive advantage.

111. Eventually, however, Wettstein told Marcoux that the other partners (L. Erasmus, N. Erasmus, and P. Dierckx) did not want her involved in the CW EU plan, even though they were not owners or managers of the Companies, which Marcoux and Wettstein jointly owned in a 50-50 partnership.

112. According to Wettstein, Marcoux was a "one percenter" and Wettstein stated that the CW EU/VB entity would be jointly owned by L. and N. Erasmus (as 33% owners), P. Dierckx (as a 33% owner) and Wettstein a 34% owner without Marcoux's involvement.

14

113.    In other words, while Marcoux was out on medical leave, Wettstein stole their idea to expand CW to Europe and replace Marcoux with L. Erasmus, N. Erasmus, and P. Dierckx as her partners in the endeavor.

114.    Although Marcoux continued to request that she be involved in the CW EU plans, she was repeatedly excluded and was never given the CW EU B2B Wave portal information or bank account information.

115.    Marcoux only uncovered this wrongdoing when attempting to locate information that she needed to operate CW after Wettstein resigned her employment with CW.

Wettstein Resigns from CW

116.    Wettstein terminated her employment in a tantrum when Marcoux did not respond to Wettstein's July 20, 2024 offer to buy her interests in the Companies for $70,000.00.

117.    Wettstein gave Marcoux a mere six days, until July 26, 2024, to accept her offer and Wettstein refused to extend the deadline so that Marcoux could obtain an expert to appraise the value of the Companies, particularly in light of the fact that Wettstein did not provide Marcoux with any updates on the Companies while she was on medical leave.

118.    When Marcoux did not respond to Wettstein's offers, Wettstein resigned her employment with CW, but not MDB.

119.    As of July 20, 2024, Wettstein was restricting Marcoux's access to important financial information regarding the Companies and was working with a company (CW EU and/or VB) that directly competed with CW, while Wettstein was still an owner of the Companies.

120.    Upon information and belief, since July 26, 2024, Wettstein has devoted a significant amount of her time and effort to CW EU/VB, a competing business, as well as two private clients, Ines di Santo and Untamed Petals, that were former CW designers that she stole

from CW, to CW's detriment, and was actively trying to destroy the Companies because she did not get her way when Marcoux refused to sell Wettstein her interests in the Companies.  For example:

    a.  Wettstein informed designers like Jimme Huang and, upon information and belief, told other CW designers that CW was having cash flow issues to facilitate their attempts to terminate their exclusive contracts with CW so that they could then leave CW and take their sales in-house or sign up with VB while at the same time Wettstein was rapidly depleting CW and MDB's accounts by: (i) sending gifts to multiple (but not all) CW designers such as fur and custom cookies, (ii) buying extravagant gifts for employees and designers, (iii) staying in elite hotels during trunk shows, (iv) spending exorbitant amounts of CW money on work dinners, (v) going on team summits without telling Marcoux about the plans (who is attending, what it's being used for, etc.), (vi) paying for non-CW/MDB employees to get headshots taken, and (vii) paying for nanny bills for Lindsey Nowak, a non-CW/MDB client or employee.

    b.  Wettstein informed employees that CW was having cash flow issues to facilitate their attempts to terminate their exclusive employment agreements with CW so they could then go work directly for CW EU/VB.

    c.  Wettstein repeatedly and selectively ignored Marcoux's requests for additional information about the Companies.  In particular, Marcoux repeatedly asked Wettstein to provide her a complete list of what job duties she performed as an employee of CW after she resigned so that Marcoux could ensure those duties were being performed after Wettstein's resignation.  Although Wettstein agreed to

provide this information, she never provided it in full, breaking her promise. Wettstein's refusal to provide Marcoux with this vital information damaged the Companies because Marcoux was not able to ensure a smooth transition after Wettstein resigned her employment, which put Marcoux in a horrible position as both employees and designers were asking questions about Wettstein's involvement, and Marcoux was not able to answer.

d. Wettstein's other actions as set forth in more detail below in Paragraph 184, which is incorporated herein.

121. In August of 2024, Marcoux contacted team members to request access to the CW EU portal.

122. One employee gave Marcoux the login information and Marcoux was able to get into the CW EU/VB portal on or about August 15, 2024, when she ran a report that showed CW EU/VB had roughly $500,000.00 in sales – sales that otherwise would have and should have gone to CW but for Wettstein's improper acts.

123. Shortly thereafter, the password for the CW EU/VB portal was changed and Marcoux was restricted from entering the CW EU/VB portal again, despite multiple requests.

124. The CW EU/VB portal was created on the same B2B Wave platform that Marcoux and Wettstein used for CW.

125. When Marcoux reached out to the administrators of B2B Wave, they informed her that they did not have authorization to grant her access to the CW EU/VB portal.

126. Notably, CW EU was conceived by Wettstein and Marcoux with the intent of selling on behalf of CW designers that did not have representation in Europe.

127.    Marcoux and Wettstein also intended CW EU to provide an opportunity for designers whose brands were not viable in the U.S. market but would do well in the European market.

128.    Although CW was already doing some business with European retailers, Marcoux and Wettstein thought the separate CW EU entity would provide an opportunity to work with them in a larger capacity.

129.    Upon information and belief, sales which should have gone through the normal CW portal began to go through the CW EU portal, which appears to have been duplicated as an exact replica of the original CW portal that Marcoux and Wettstein spent considerable time, effort and money to develop.

130.    In fact, Wettstein directed CW employees, such as Olivia Vari, Amelia Day, Lisa DiTroia, and A. Otko, who were paid by CW, to help facilitate and create a new portal for CW EU/VB, using CW's confidential and trade secret information, CW brand assets, and other CW information about designers and clients such as customer lists and contact information, and their current orders with CW.

131.    In other words, Wettstein directed CW employees to perform work and services on behalf of CW EU/VB, a company that competed with the Companies, while they were under contract with CW or MDB.

132.    In addition to this, Wettsein shared CW's proprietary SaaS framework, systems, and portal with CW EU/VB employees without requiring an NDA to protect the Company or taking any other steps to protect the Companies' confidential and trade secret information.

133.    Wettstein directed contracted employees to duplicate CW's custom-built B2Bwave.com portal for designers while on company time and during their employment with

either CW or MDB. As a result, this misappropriation gave CW designers and CW EU/VB an unfair advantage because they could convince CW designers to break their contracts with CW and bring their sales in-house and/or sign with CW EU/VB because they were able to immediately recreate CW's framework and systems, including but not limited to CW's custom B2Bwave.com portal, so they could pitch a seamless transition to CW's former designers.

### CW EU/VB Steals CW's Clients

134.    Towards the middle of August 2024, six of CW's most lucrative clients, namely Nicole + Felicia, Ines di Santo, Senstudio, Hera Courture, Trish Peng and Steven Khalil**,** all informed Marcoux that they were separating from CW effective immediately.

135.    Normally, separation from clients is an amicable process governed by contract, during which there is a 45 day period where CW continues to collect balances and an agreement to close out all orders taken through the CW portal so that balances may be collected until all orders are clear.  This provision is set forth in an exclusive contract between CW and designers.

136.    Although Wettstein initially asked Marcoux to join her in the off-boarding of these clients, Wettstein eventually began to off-board the clients on her own, even though Marcoux asked to join these meetings and tried to reschedule them for when both could attend.

137.    Wettstein selectively supplied Marcoux limited information relating to the terms that had been agreed upon between CW and designers or which balances would be collected and/or if orders could be closed out.

138.    Upon information and belief, Wettstein intentionally and purposefully withheld a significant amount of information relating to the off-boarding terms between CW and designers so that Wettstein could ensure any pending orders benefited CW EU/VB, at the expense of the Companies.

139.    Upon information and belief, Wettstein excluded Marcoux from the off-boarding meetings with CW clients so that Wettstein could work with and help these former CW clients sign on with CW EU/VB, a competitor of the Companies.

140.    In addition to the separation with the aforementioned designers, CW employees also started to resign in an unusual fashion, including L. Walsh, O. Vari, Erica Hall, Miranda Howard, Emily McGrew, L. DiTroia and Courtney McNamara, who all resigned at the end of August 2024.

141.    Most of those who resigned did not give details regarding their future employment.

142.    Marcoux later learned from a client, Steve Lang, that departing employee M. Howard, who represented Idan Cohen, was given an introduction for a job at a competing designer by Wettstein.

143.    Marcoux did what she could from August into the fall of 2024 to keep the Companies afloat, short staffed, with no assistance from Wettstein, who resigned her employment, locked Marcoux out of accounts, and helped CW employees and clients leave CW to join VB and other competing companies.

144.    Marcoux traveled to the Chicago Bridal Market to represent Modeca and Pure, along with three remaining CW employees, A. Day, A. Otko and Thendo Tshikororo.

145.    While in Chicago, two employees expressed shock about the turn of events with all the off-boarding and resignations that had occurred and mentioned that Wettstein had used them to help create CW EU/VB while Marcoux was out on leave to the detriment of the Companies but to the benefit of Wettstein's new business partners L. Erasmus, N. Erasmus, and P. Dierckx.

146.    A. Day also explained that Wettstein approached her and told her that, as an owner of CW, she should not advise any employee to do this but that she recommended this employee should leave CW and if the employee wanted to, Wettstein could find her a job.

147.    When the employee expressed her interest in staying at CW, Wettstein encouraged her to request a raise of almost $20,000.00 from Marcoux at a time when Wettstein was informing clients and others that CW was struggling financially due to the sudden mass exodus of designers.

148.    Upon information and belief, Wettstein was purposefully acting to financially ruin the Companies by draining their financial accounts so that she would be freed to work exclusively with CW EU/VB.

149.    On September 15, 2024, a retail owner and buyer at the Chicago market sent Marcoux a text and forwarded an email announcing the creation of Voeux Blancs.

150.    The retailer asked Marcoux if she had started a new agency as the branding and name felt familiar and similar to Coterie White and the Melange de Blanc brand.

151.    Marcoux called Wettstein immediately thereafter to ask if she knew about the new agency.

152.    In response, Wettstein ignored Marcoux's question and instead began insulting her character by taunting her with statements such as "no one likes you," "see how all your employees quit," "no one wants to work with you."

153.    After attacking Marcoux for several minutes, Wettstein eventually responded to her question, stating "No I do not know about them but I am sure I can find out."

154.    Marcoux was told by her employee, T. Tshikororo, that there was an audience of buyers and CW clients watching her as she became upset and who could hear Wettstein yelling so her employee asked her to walk away from the booth.

155.    As a result of this abusive language, Marcoux was shaken and unable to present and sell on behalf of her clients with her normal level of expertise and ability to close sales.

156.    Voeux Blancs announced in that email to retailers that all their Coterie White past orders were transferred to their VB portal so they would be able to access all of their previous CW order history and information in the VB B2Bwave.com portal.

157.    In other words, VB was acknowledging that it stole CW's B2Bwave.com portal and misappropriated CW's confidential and trade secret information to create a seamless transition for retailers leaving CW and joining VB.

158.    Upon information and belief, CW EU and VB are one and the same, and the name VB was adopted in a futile effort to distinguish it from CW EU and the Companies so it would appear to be a separate entity.

159.    Thereafter, Marcoux received emails from retailers who did not work with or buy VB's brands but were still somehow added to VB's portal without their permission.

160.    These retailers were confused because the emails they received referenced VB's logo and VB's portal but had a CW email account (hello@coteriewhite.com) at the bottom of the email and included their CW order ID numbers.

161.    Marcoux reached out to the owners of the B2B portal to explain that there seemed to be a data breach and expressed her and her customers' concerns about their information being copied without their permission.

MDB's October Market

162.    At Melange de Blanc's October 2024 market, Wettstein did not assist any CW designers to sell as she historically did and she did not familiarize herself with sales materials

22

and/or products of CW's designers. Wettstein also did not check on A. Day, T. Tshikororo, Joy Kinder or any other CW employees or ask if they needed any help.

163. Instead, Wettstein spent most of her time socializing with former CW designers as well as the VB designers, Nicole + Felicia and Steven Khalil, who were now being represented by former CW employees that were now employed by VB, like L. Wash, and L. Erasmus and D. Dierckx, when traditionally she would use the time for team building dinners, interacting with CW designers to build stronger relationships and otherwise taking actions that would benefit CW or MDB, as opposed to directly assisting a competitor of the Companies, VB.

164. At the market, a store owner in Dubai informed Marcoux that Wettstein would be attending a Nicole + Felicia trunk show in Dubai in November to represent a designer that terminated CW in August, just a month before. A retail buyer interested in one of the brands also arrived showing an email to T. Tshikororo that stated she had an appointment with Wettstein to review the collection, Ines di Santo, a brand that off-boarded in August.

165. In other words, Wettstein worked directly with a former CW client, competing with CW, at the expense of Marcoux and the Companies.

166. To attend that trunk show and work directly with a designer and help a competing agency, Wettstein purchased tickets for herself and her husband using CW funds.

<u>Companies Hire Consultants</u>

167. The Companies retained Jay Cox to work as an accounting consultant because he had previously worked with Marcoux and Wettstein and was knowledgeable about the bridal industry.

168. Based on her prior work with Cox, Marcoux expected that it would be easy to work with Cox and that she would be included in discussions regarding the Companies' books and finances.

169. Instead, Wettstein quickly took over the role of engaging with Cox and often left Marcoux out without any summaries of their discussions.

170. Cox and Wettstein began to have Wednesday morning finance meetings when Marcoux was on medical leave.

171. When Marcoux returned, she requested to be added to the meetings as well as to be given an update regarding the Companies' financial state and a summary of what took place while she was out. Cox and Wettstein provided a confusing series of spreadsheets with erroneous entries.

172. In July 2024, when it became apparent that there was a fracture in the relationship between Marcoux and Wettstein when Marcoux returned from medical leave, Cox offered himself as a "mediator" to negotiate between the business partners.

173. In his conversations with Marcoux, Cox repeatedly told Marcoux that if she did not accept Wettstein's offer to buy her out of the Companies for a total of $75,000, Wettstein would destroy the Companies.

174. At the time, Marcoux thought Cox's prediction that Wettstein would destroy the Companies if she did not get her way was hyperbolic. However, as set forth below, Marcoux would soon learn that Cox's prediction was eerily accurate.

175. In August of 2024 Marcoux questioned Cox's role with the Companies as she had begun to observe that he was not impartial as he had claimed and would often act as an echo chamber for Wettstein's beliefs and assertions. Marcoux requested that Cox provide a list of

weekly duties and deliverables he performed for the Companies to justify his $4,500.00 monthly salary.

176.    Wettstein responded that it was insulting to request such information.

177.    Cox responded to Marcoux by directing her to inspect his LinkedIn profile, and he never provided her the information she requested.

178.    Starting in or about February of 2024, Cox began to book appointments to have CW EU meetings that intentionally excluded Marcoux, notwithstanding Marcoux's repeated requests to Cox and Wettstein that she needed to be involved in CW EU matters.

179.    Cox informed Marcoux that he did not believe CW and CW EU were or should be separate companies and, therefore, Marcoux should be kept up to date and informed about both CW and CW EU's finances and books.

<u>Wettstein's New Partner Offers to Serve as 'Neutral' Mediator</u>

180.    In June of 2024, P. Dierckx expressed concern about the deteriorating relationship between Marcoux and Wettstein.

181.    Feigning to be a neutral mediator, P. Dierckx contacted Marcoux and offered to buy her interest in the Companies so that he could then own the Companies together with Wettstein.

182.    At the time P. Dierckx offered to buy Marcoux's share of Companies, he falsely represented that Marcoux and Wettstein had made no progress on their CW EU expansion plans and that he knew nothing of a CW EU bank account.

183.    Even more concerning, at the time P. Dierckx offered to buy Marcoux's share of the Companies, he had already agreed to partner with Wettstein as a 33% owner of CW EU/VB

and was already working with his son, D. Dierckx, N. Erasmus, L. Erasmus, and Wettstein to develop and grow VB.

<u>Wettstein's Misconduct, Deceit, and Breach of Fiduciary Duties</u>

184.    This complaint arises out of Wettstein's deliberate and intentional breach of her fiduciary duty of loyalty that she owed to CW, MDB and Plaintiff as 50-50 co-owners of CW and MDB.  Wettstein repeatedly, intentionally, and wrongfully breached her duty of loyalty by:

(i)    taking action on behalf of CW and MDB without Marcoux's approval or input and concealing those actions from Marcoux in an effort to keep her in the dark, for example:

a.  Hiring and interviewing employees without Marcoux's knowledge, consent or input both before, during and after Marcoux was out on medical leave;

b.  Appointing N. Erasmus, L. Erasmus, and P. Dierckx as "co-owners" of Coterie White Europe without Marcoux's consent or input, and without requiring them to sign a contract, an NDA, or any documentation detailing their job descriptions or pay structure, even though Marcoux expressly requested this information on multiple occasions;

c.  Removing or blocking Marcoux from accessing or viewing important software and platforms (e.g. Canva, Stripe, QuickBooks, Squarespace and the CW EU B2Bwave.com portal) that are needed to operate the Companies.

d.  Off-boarding designers without Marcoux, even though Marcoux requested to attend these meetings, in an effort to keep Marcoux in the dark about the Companies' operations;

e.   Telling team members to ask Marcoux for raises at a time Wettstein told Marcoux that the Companies had limited financial resources;

f.   Getting employees new jobs at competitors while they were still employed by CW and under employment agreements that were subject to non-compete provisions;

g.   Not protecting the Companies when a competing agency, Voeux Blancs, was coming to Melange de Blanc's market and was in position to do even more damage and harm to both Companies;

h.   Selling her services privately to a CW client, Steve Lang, when she initiated a sales conversation in which she proposed to a current CW client that they terminate their contract with CW and take Wettstein on as an independent sales representative performing the same tasks, duties, and roles as CW had so Wettstein could divert funds that should have been paid to CW for her own private enrichment; upon information and belief, using the Companies' resources, Wettstein sent emails and created a presentation to support her plan to steal a designer from CW;

i.   Upon information and belief, Wettstein tried to initiate sales conversations with more than just that one CW designer;

j.   Using CW and MDB resources, intellectual property, employees and funds to create a company that competed with CW and MDB when she was still a member, officer, agent and, upon information and belief, an employee of CW and MDB; for example, attached hereto is **Exhibit 5** is an email dated July 24, 2024, where Wettstein is using CW assets and resources to perform work for

27

CW EU/VB, without Marcoux's knowledge, consent or approval in an effort to enrich herself at Marcoux's expense;

k.  Upon information and belief, assisting and instructing current and former employees (and others such as L. Erasmus, N. Erasmus, and Dylan Dierckx) to misappropriate CW and MDB confidential information and trade secrets so that they could then use the confidential information and trade secrets to compete with CW and MDB at their new jobs with the company Wettstein created to compete with CW and MDB, which is now known as CW EU/Voeux Blancs;

l.  Upon information and belief, intentionally and maliciously refusing to pursue legal action against departing employees, against the advice of corporate counsel and Marcoux's request, to assert claims that they were misappropriating CW and MDB confidential and trade secret information and then using such confidential and trade secret information on behalf of Voeux Blancs, a competitor of the Companies that Wettstein started with L. Erasmus and D. Dierckx (son of P. Dierckx), even though these actions were irreparably harming the Companies.

(ii)  using CW and MDB resources, intellectual property, employees and funds to create a company that competed with CW and MDB when she was a member, officer and agent of CW and MDB and, upon information and belief, while she was still an employee of CW.  For example:

a.  Using CW and MDB employees to perform work for Coterie White Europe and/or VB and paying them to perform this work using CW and MDB funds without Marcoux's knowledge, consent or approval; for example, attached

28

hereto as **Exhibit 6**, is an email dated July 26, 2024 where Wettstein is using CW employees and misappropriating CW intellectual property to create the VB B2B Wave Portal, without Marcoux's knowledge, consent or approval;

b. Using CW and MDB's accountant, who was paid using CW/MDB funds, to perform work on behalf of Coterie White Europe/VB without Marcoux's knowledge, consent or approval; for example, attached hereto as **Exhibit 7** is an email from Wettstein to L. Erasmus, A. Otko, and N. Erasmus dated June 6, 2024 where Wettstein acknowledges using the Companies' accountant to perform work on behalf of CW EU/VB;

c. Misappropriating CW and MDB copyright protected photographs, plans and other copyright protected works and using them on behalf of Coterie White Europe/VB without Marcoux's knowledge, consent or approval; and

d. Upon information and belief, granting former employees access to CW and MDB resources, intellectual property, and platforms so that they could more easily misappropriate CW and MDB's confidential and trade secret information.

(iii)   assisting and instructing former employees to misappropriate CW and MDB confidential information and trade secrets so that the former employees could use the confidential information and trade secrets to compete with CW and MDB at their new jobs with the company that Wettstein created to compete with CW and MDB, which is now known as Voeux Blancs. For example:

a. Training CW and MDB employees on the Companies' B2B Wave Portal so that they could misappropriate the custom-built portal that CW developed over a

significant period of time and use it on behalf of Voeux Blancs so that any CW/MDB designers VB stole would not notice any changes when switching from CW/MDB to VB;

b.  Granting and facilitating current and former employees access to CW/MDB accounts, resources, trade secrets and copyright protected materials so that these employees could use that confidential, trade secret and other protected information on behalf of VB, a competitor to CW/MDB;

c.  Unilaterally deciding, without Marcoux's input or consent, to strike the noncompete provisions from departing employees' employment agreements, like E. McGrew, to assist them in working for a competing entity, VB and not having departing employees, like E. Hall, sign separation agreements as they had in the past; and,

d.  Upon information and belief, assisting or instructing departing employees, E. Hall and L. Erasmus, to delete CW/MDB trade secrets, intellectual property and confidential information from the Companies' drives, even though the employees and Wettstein knew that this was CW and MDB's property, which they had no right to delete.

(iv)  withholding and refusing to provide Marcoux with requested financial information relating to CW and MDB, as well as withholding and refusing to provide Marcoux with information she needed to operate CW and MDB after Marcoux refused to accept a buyout without accurate financial information about the Companies and, as a result, Wettstein unilaterally terminated her employment with CW, which, upon information and belief, was an attempt to artificially portray Marcoux in a bad

light and make it look like Marcoux did not know what she was doing (which was partly true but only because Wettstein kept Marcoux in the dark). For example:

    a. Responding to Marcoux's requests for information by providing the information in a format or manner that was not helpful, that appeared designed to confuse and obfuscate, and when Marcoux asked for explanations, Wettstein failed to respond to keep Marcoux in the dark;

    b. Refusing to provide Marcoux login and passwords for many of the Companies' accounts on third-party platforms such as Stipe, QuickBooks, Canva, Squarespace and Honeybook which were needed to operate the Companies;

    c. Removing and blocking Marcoux from several company accounts, such as CW and MDB's Google Drive and documents; Wettstein's CW/MDB calendar so Marcoux was unaware of what Wettstein was working on, and Canva, an online graphic design tool the Companies used to create social media posts, presentations, posters, videos and more, which were, upon information and belief, resources purchased using CW funds;

(v) working on behalf of Voeux Blancs while still a member-manager of CW and MDB to the detriment of CW and MDB, for example:

    a. Using CW and/or MDB funds to pay for flights to go to Nicole + Felicia's trunk show in Dubai while working for and on behalf of VB, even though the designer was still a CW client, and, upon information and belief, at a time that Wettstein knew the designer was ending their relationship with CW so that Wettstein could personally benefit after the designer terminated its relationship with CW;

b. Booking market appointments for former CW and non-CW designers like Ines di Santo and upon information and belief selling at market for former CW and non-CW designers;

c. Helping VB misappropriate CW and MDB's clients by helping manage VB portal orders that were mistakenly being sent from a CW email account (hello@coteriewhite.com, which was used for CW Europe) which was still being used only due to VB's complete misappropriation of CW's custom B2B Wave Portal; and,

d. Upon information and belief, working directly on behalf of two former CW designers, Ines di Santo and Untamed Petals, in her personal capacity and for financial gain, while still a member-manager of CW and MDB and to the detriment of CW and MDB;

e. Allowing employees that the Companies spent considerable time, effort and resources to train to leave and terminate their employment with the Companies without a separation agreement (or making any other effort to protect the Companies' interests because Wettstein seemed more interested in helping VB, a competitor) and after releasing them from the non-compete clauses in their employment agreements with the Companies (without Marcoux's consent) so they could immediately begin to work for VB;

f. Selling MDB market spaces to VB designers such as Nicole + Felicia and Steven Khalil, for a fraction of the price that CW designers paid;

g. Allowing VB designers like Hera Couture and Trish Peng to get into the market early to set up their booths at a time when historically only CW designers were

permitted to set up at past markets, to the detriment of CW clients and to the benefit of CW's competitor, VB.

(vi) attempting to force Marcoux into buying out Wettstein's interest in MDB and CW after Wettstein misappropriated and stole MDB and CW confidential information and trade secrets that she then conveyed to individuals working for CW EU/VB to harm MDB and CW. For example:

a. Threatening to destroy the Companies if Marcoux did not sell Wettstein her interest in the Companies saying "you underestimated me" during a call in which they discussed the mass exodus of designers and employees;

b. Refusing to permit Marcoux to have the Companies appraised so that she could make a rational decision with regard to whether to sell her interests in the Companies;

c. Constantly pressuring Marcoux to sell her interests in the Companies to Wettstein and, in the alternative, pushing Marcoux to buy Wettstein's interests in the Companies so that she could be released from any and all claims; and

d. Working with the Companies' accountant to pressure Marcoux to sell her interests in the Companies to Wettstein because, according to the Companies' accountant, Wettstein would blow everything up if Marcoux did not agree to sell her interests.

(vii) Upon information and belief, conspiring with CW's accountant to conceal Wettstein's intentional mismanagement of MDB and CW's finances in a thinly veiled attempt to bankrupt CW and MDB so that CW's designers/brands could immediately terminate their contracts with CW, freeing them to work in-house

without CW's representation and/or to join VB, the company Wettstein created to replace CW and MDB after she destroyed them. For example:

a.  Wettstein and the Company's accountant, Jay Cox, held multiple meetings without updating Marcoux in an effort to keep her in the dark about the Companies' finances so that she would feel pressured to sell her interests to Wettstein;

b.  Upon information and belief, concocting a scheme to use the Companies' financial resources to help Wettstein create VB, a company that would compete with MDB and CW;

c.  In late summer and/or early fall of 2024, using MDB and CW resources for extravagant trips, gifts, photoshoots for herself, CW and non-CW employees, paying, planning and attending a MDB summit in Charleston with both CW and non CW employees such as E. Hall, O. Vari, C. McNamara and L. Nowak, and upon information and belief, at the time Wettstein incurred these expenses (without Marcoux's knowledge, consent or approval), Wettstein knew these employees were going to quit and work for a competing company (they all quit shortly after the MDB photoshoot and summit) and was intentionally trying to drain the Companies' accounts to allow designers to escape their exclusive contracts with CW because those contracts allowed a designer to terminate the contract upon CW's financial insolvency; and,

d.  Developing a system where CW and MDB were funding VB and/or Coterie White Europe without Marcoux's knowledge, consent or agreement.

(viii)   conspiring with CW designers to allow them to break their exclusive sales agreements with CW so that they would be free to bring sales in-house and/or join Voeux Blancs, the company Wettstein created to compete with CW and MDB;

    a.   Initiating a sales conversation(s) with a CW designer(s) in which Wettstein proposed that the CW client terminate its contract with CW and take her on directly as an independent sales representative so that Wettstein could divert funds that should have been paid to CW for her own private enrichment;

    b.   Refusing to include Marcoux in off-boarding meetings with designers so that they could easily move to VB, a competing company that Wettstein helped create;

    c.   Refusing to provide Marcoux notes or summaries of key terms or conditions relating to the departing designers that were being off-boarded; and

    d.   Allowing CW and MDB employees to leave to go work for VB or another competing company without a separation agreement, while releasing them from the non-compete provisions in their employment contracts with the Companies and taking no other actions to protect the Companies' interests or to protect the Companies' confidential and trade secret information.

(ix)   upon information and belief, disclosing personal medical information about Marcoux to designers and buyers after Marcoux was in a car accident and took a medical leave of absence due to a traumatic brain injury in an effort to disparage Marcoux and blame her for CW and MDB's operational and financial difficulties;

(x)   upon information and belief, disparaging Marcoux when speaking with designers in an effort to blame CW and MDB's financial and operational difficulties on

Marcoux in order to encourage designers to leave CW and MDB so that they could join Voeux Blancs; and,

(xi)    upon information and belief, after mismanaging the Companies' finances in an effort to destroy them so that she could join Voeux Blancs, Wettstein encouraged employees to ask for a raise, knowing that the Companies were in a difficult financial position; Wettstein also encouraged and helped employees get new jobs, which damaged the Companies' reputation; and Wettstein also encouraged employees to quit after Wettstein herself resigned as an employee.

<u>Wettstein's Acts and Omissions Caused Marcoux Severe Emotional Distress</u>

185.    Wettstein's constant intimidation, manipulation, lies, blame shifting and gas lighting caused Marcoux extreme amounts of stress and mental anguish, which harmed her health, personal work, home life and personal life.

186.    Wettstein would often ask Marcoux questions, feigning concern about her home or personal life to only throw it in Marcoux's face and use it against Marcoux at another time.

187.    For example, Wettstein asked Marcoux about her pregnancy and told Marcoux to take maternity leave but then Wettstein used it against Marcoux by shouting at her saying that because she took maternity leave she did not care about the Companies and that by caring for her newborn, Marcoux was negatively impacting CW and/or MDB.

188.    Accordingly, when Marcoux became pregnant for the second time, she was petrified to tell Wettstein.

189.    On the morning of Marcoux's medically scheduled C-section in July of 2022, about which Marcoux had informed Wettstein, Wettstein asked that Marcoux sign a lease agreement, showing blatant disregard for Marcoux's health and well-being.

190.     In July of 2022, only one or two weeks postpartum, Wettstein expected Marcoux facilitate a company move while breastfeeding her newborn, demonstrating total indifference to the needs and health of Marcoux and her child during such a fragile recovery period.

191.     Wettstein also caused Marcoux severe emotional distress by telling designers, VB employees, factories and ex-team members that Marcoux was deliberately not paying them or was blocking Wettstein from paying bills.

192.     Upon information and belief, Wettstein did so deliberately to ruin Marcoux's reputation and relationships.

193.     In addition, Wettstein's gas lighting included promising to provide Marcoux a list of job duties she performed for CW when she resigned her employment and later refusing to do so to hinder Marcoux's efforts to continue the company running smoothly and to sabotage the company's financial stability through reckless and unilateral decisions.

194.     As a result of Wettstein's constant intimidation, manipulation, lies, blame shifting, gas lighting, and abusive behavior, Marcoux developed increasing levels of stress and anxiety, has been prescribed anti-anxiety medication and sought medical treatment for stress, anxiety and emotional distress.

195.     In fact, as a direct and proximate result of Wettstein's conduct described herein, Marcoux has suffered severe emotional and physical harm, including a diagnosis of PTSD and anxiety, which her therapist and doctor have attributed to Wettstein's actions.

196.     Marcoux has also experienced frequent panic attacks, nightmares and an inability to sleep due to Wettstein's actions.

## COUNT I
### Breach of Fiduciary Duty

197.     Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

198.     Pursuant to 11 V.S.A. § 4059, members owe two fiduciary duties to a member-managed limited liability company and its other members: (1) the duty of loyalty and (2) the duty of care.

199.     As set forth in 11 V.S.A. § 4059(b), a member's duty of loyalty to a member-managed limited liability company and its other members includes:

(1) To account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of the company's opportunity;

(2) To refrain from dealing with the company in the conduct or winding up of the company's business as or on behalf of a party having an interest adverse to the company; and

(3) To refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

200.     Courts in Vermont have held that Vermont case law regarding small business corporations is pertinent to LLCs and have explained that "[t]he relationship of a director-stockholder to his corporation binds him to use the utmost good faith and loyalty for the furtherance and advancement of the interests of that corporation. He is not permitted to make profit for himself in the transaction of the business of the corporation, against its interest." *Lash v. Lash Furniture Co. of Barre*, 130 Vt. 517, 522 (1972) (citation omitted); *J.A. Morrissey, Inc. v. Smejkal,* 2010 VT 66, ¶ 11.

201.    Here, for the reasons set forth above, Wettstein failed to use the utmost good faith and loyalty for the furtherance and advancement of the interests of the Companies. Instead, Wettstein breached her duty of loyalty by making profit for herself in transactions of the business of the Companies, against the interests of the Companies and the co-owner of the Companies.

202.    For example, as set forth above in Paragraph 184(i)-(xi) Wettstein breached her fiduciary duty of loyalty by:

    a.  encouraging employees of the Companies to ask for a raise and look for other jobs at a time that she knew the Companies were in a difficult financial position.  For example, as set forth in **Exhibit 8**, an email from an employee to Marcoux dated September 19, 2024, attached hereto, on or about August 21, 2024, Wettstein instructed an employee to ask for a raise and informed the employee that, although "legally she cannot tell [the employee] to leave CW but that she would notify [the employee] of any job leads" and then Wettstein listed designers the employee should reach out to.  The employee also noted that Wettstein informed her she "h[ad] all the power right now and [should] go to Kim and ask for a raise." In other words, Wettstein was actively trying to harm the Companies by encouraging employees to ask for raises, knowing that the Companies could not afford to pay raises and at the same time Wettstein was telling third parties that the Companies were insolvent and to seek employment elsewhere.

    b.  Using CW employees, who were paid by CW, to work for CW EU/VB without notifying Marcoux and without obtaining her approval.  For example, attached hereto as **Exhibit 9**, an email dated June 4, 2024 in which a CW employee expresses her excitement to be working for CW EU/VB while being paid by and employed

by CW.  Notably, Wettstein's efforts to have CW employees work for CW EU/VB, while being paid by the Companies, damaged the Companies and Marcoux, while enriching Wettstein and her clandestine efforts to create a company to compete with the Companies.

c.  Upon information and belief, an additional example of Wettstein using CW funds to pay employees to perform work for CW EU/VB is set forth in **Exhibit 10**. **Exhibit 10** is an email dated June 25, 2024 from Wettstein to N. Erasmus paying N. Erasmus using CW funds for work that he exclusively performed for CW EU/VB without Marcoux's knowledge or consent.  **Exhibit 11** is an email dated July 23, 2024 from Wettstein to N. Erasmus disclosing an additional payment that Wettstein made to N. Erasmus using CW funds, from CW's bank account, without Marcoux's knowledge or consent so that Wettstein could use CW as a piggy bank to create a new, almost identical, bridal sales agency that she could join after she ran the Companies into the ground.

d.  Wettstein diverted payments that should have gone to CW to CW EU/VB.  For example, on May 18, 2024, she emailed N. Erasmus, sending him a spreadsheet with the comment "I will add your recon sheet on here so that I can figure out what went into the US account."  A true and accurate copy of that email is attached as **Exhibit 12**.

e.  Wettstein further shared confidential and proprietary information of the Companies with N. Erasmus, L. Erasmus and others so that they could use that information on behalf of VB.

203.    For the reasons set forth above and expressly incorporated herein, Wettstein breached her fiduciary duties because she has:

    a.    Failed to account to the Companies and to hold as trustee for the Companies any property, profit, or benefit she derived in conducting the business of the Companies or derived from her use of the Companies' property, including the appropriation of the Companies' opportunity, namely, CW EU, which opportunity Wettstein appropriated for herself;

    b.    Dealt with the Companies in the conduct of the Companies' business as or on behalf of parties having interests adverse to the Companies, namely VB and/or CW EU; and,

    c.    Flagrantly competed with the Companies in the conduct of the Companies' business before the dissolution of the Companies by working directly with current and former CW clients, at CW's expense.

204.    As a direct and proximate cause of these actions, Marcoux and the Companies have been harmed in an amount to be proven at trial, including, but not limited to, damages attributable to the severe emotional distress caused by Wettstein's acts and omissions described herein.

<u>**COUNT II**</u>
**Disgorgement of Defendant's Compensation After She Breached Her Fiduciary Duty**

205.    Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

206.    Plaintiff seeks a judgment requiring Wettstein to repay any and all compensation or remuneration she received as a member, officer or employee of CW or MDB following Wettstein's breach of the fiduciary duty of loyalty she owed to Marcoux, CW, and MDB.

207.    In *Hirchak v. Hirchak*, 2024 VT 81, ¶ 43, the Vermont Supreme Court held that a corporate officer is not entitled to compensation for services when that officer engages in activities constituting a breach of the duty of loyalty to the corporation.

208.    Indeed, the Vermont Supreme Court in *Hirchak* noted that "[i]t is one of the fundamental principles of agency that an agent guilty of misconduct and fraud in relation to the transaction of the principal's business is not entitled to compensation for his or her services." *Id.* (quoting 16A Fletcher Cyclopedia of the Law of Corporations § 2145 (2024)).

209.    As set forth above, Wettstein breached the duty of loyalty she owed to CW and Marcoux when she misappropriated the CW EU opportunity for herself and new partners, excluding Marcoux from the corporate opportunity that belonged to CW.

210.    Wettstein further breached her duty of loyalty when she used CW funds to pay CW employees to perform work and services on behalf of VB, a competing entity.

211.    Accordingly, Marcoux respectfully requests that the Court enter a judgment ordering Wettstein to repay any and all compensation or remuneration she received as a member, officer, or employee of CW or MDB following Wettstein's breach of the fiduciary duty of loyalty she owed to Marcoux, CW, and MDB.

**COUNT III**
**Unjust Enrichment**

212.    Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

213.    Under a claim for unjust enrichment, "a party who receives a benefit must return the benefit if retention would be inequitable." *Kellogg v. Shushereba*, 2013 VT 76, ¶ 22.

214.    A "basic principle of unjust enrichment" is that "[a] person is not permitted to profit by h[er] own wrong." *Hirchak*, 2024 VT 81, ¶ 27 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 3 (2011)).

215.    A benefit was conferred on Wettstein when she used the Companies' funds, without Marcoux's consent, knowledge and approval, to buy a WHOOP watch (with a monthly subscription), to purchase secretly planned personal travel or travel that did not benefit the Companies, such as tickets to Dubai that actually benefited VB, the Companies' competitor, to purchase two laptops for CW EU/VB employees using CW funds, to buy roughly $2,500 of photography equipment for her husband, and to buy personal subscriptions, hotel rooms and egregiously priced dinners.

216.    A benefit was further conferred on Wettstein when she used the Companies' funds, employees, intellectual property, confidential information, and trade secrets, without Marcoux's consent, knowledge or approval, to create, develop and operate CW EU/VB, an entity that directly competed with the Companies.

217.    Wettstein accepted the benefits described above by buying the watch, traveling using the Companies' funds and attending the dinners.  Wettstein further accepted the benefits by using the Companies' funds, employees, intellectual property, confidential information and trade secrets to benefit a new entity, CW EU/VB, which she created behind Marcoux's back and which misappropriated a corporate opportunity of the Companies.

218.    Based on the totality of the circumstances, it would be unjust for Wettstein to retain the benefits she improperly obtained.

219.    Marcoux requests that the Court enter a judgment requiring Wettstein to pay damages in an amount to be proven at trial based on the value of the benefits Wettstein improperly

and unjustly obtained at the expense of Marcoux and the Companies, together with damages attributable to the severe emotional distress caused by Wettstein's acts and omissions.

## COUNT IV
### Judicial Dissociation of Christina Wettstein

220.    Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

221.    Pursuant to 11 V.S.A. § 4081(5), a member of a limited liability company, such as CW or MDB, may seek an order expelling another member of the limited liability company when the member has either "engaged in wrongful conduct that has adversely and materially affected. . . the company's business;" "willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under section 4059 of this title; or" has "engaged in conduct relating to the company's business which makes it not reasonably practicable to carry on the business with the person as a member."  11 V.S.A. § 4081(5)(A)-(C).

222.    As set forth above, Wettstein engaged in wrongful conduct that adversely and materially affected CW and MDB by: (i) misappropriating the corporate opportunity of CW EU behind Marcoux's back; (ii) blocking or removing Marcoux from accessing or viewing important software and platforms used by the Companies before and after Wettstein resigned from her employment; (iii) helping CW employees terminate their employment, get new jobs, and demand raises at a time Wettstein knew the Companies lacked funds to provide a raise; (iv) helping CW clients terminate their exclusive agreements with CW so that the CW clients could sign with CW EU/VB, a competing bridal agency; (v) using the Companies' resources, intellectual property, employees, labor and funds to create a new company that compete directly with CW when she was still a member, officer, agent and employee of the Companies; and (vi) taking action or failing to act in the manner set forth in more detail in Paragraph 184 above.

44

223.    As set forth above, Wettstein willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under 11 V.S.A. 4059 by: (i) misappropriating the corporate opportunity of CW EU behind Marcoux's back; (ii) blocking or removing Marcoux from accessing or viewing important software and platforms used by the Companies before and after she resigned from her employment; (iii) helping CW employees terminate their employment, get new jobs, and demand raises at a time Wettstein knew the Companies lacked funds to provide a raise; (iv) helping CW clients terminate their exclusive agreements with CW so that the CW clients could sign with CW EU/VB, a competing bridal agency; (v) using the Companies' resources, intellectual property, employees, labor and funds to create a new company that competes directly with CW and MDB when she was still a member, officer, agent and employee of the Companies; and (vi) taking action or failing to act in the manner set forth in more detail in Paragraph 184 above.

224.    As set forth above, Wettstein engaged in conduct relating to CW and MDB's business which makes it not reasonably practicable to carry on the business with Wettstein as a member of CW or MDB by: (i) misappropriating the corporate opportunity of CW EU behind Marcoux's back; (ii) blocking or removing Marcoux from accessing or viewing important software and platforms used by the Companies before and after she resigned from her employment; (iii) helping CW employees terminate their employment, get new jobs, and demand raises at a time Wettstein knew the Companies lacked funds to provide a raise; (iv) helping CW clients terminate their exclusive agreements with CW so that the CW clients could sign with CW EU/VB, a competing bridal agency; (v) using the Companies' resources, intellectual property, employees, labor and funds to create a new company that competes directly with CW and MDB when she was

45

still a member, officer, agent and employee of the Companies; and (vi) taking action or failing to act in the manner set forth in more detail in Paragraph 184 above.

225.    Accordingly, Plaintiff respectfully requests that the Court issue an Order expelling Christina Wettstein as a member of CW and MDB, after a full review of the Companies' financial status and tax obligations, to be paid by Wettstein's actions resulting in her dissociation from CW and MDB in accordance with the provisions set forth in 11 V.S.A. § 4081(5).

**COUNT V**
**Misappropriation of Trade Secrets**
**In Violation of the Defend Trade Secrets Act 18 U.S.C. § 1836**

226.    Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

227.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3) defines a trade secret as "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not know or use the trade secret.

228.    The Companies' confidential and proprietary information stolen and misappropriated by Wettstein includes, among other things, training materials, employee roster and salary lists, employment and third-party contracts, business strategies, customer lists and orders, lead lists and leads, and designer contacts.  In addition, CW's confidential and proprietary information that Wettstein stole and misappropriated also includes data associated with CW's custom B2Bwave.com portal that Wettstein and Marcoux spent significant amounts of time, effort and resources to develop.

229.    Wettstein stole and misappropriated this confidential and proprietary information through improper means because, as a co-owner and member-manager of the Companies, Wettstein breached both her duty to maintain secrecy or limit the use of such information as well as her duty of loyalty when she misappropriated and stole this confidential and proprietary information for the benefit of Voeux Blancs, a competitor of the Companies.  Under the DTSA, "improper means" is defined as including "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  18 U.S.C. § 1839(6).

230.    This material constitutes trade secrets under the DTSA, all of which would provide and has provided a competitor a significant advantage in creating a bridal agency that could compete with CW and MDB.

231.    The Companies derive independent economic value from their confidential data and trade secrets including their employee data, customer lists, pending orders, business organization and strategies, custom B2Bwave.com portal, and the Companies' pricing information.

232.    The Companies' trade secrets are related to products or services used in interstate commerce because they sell bridal gowns in interstate commerce.

233.    The Companies take steps to protect this confidential and proprietary information by restricting employees' access, using password protected logins for certain information, and having employees sign nondisclosure agreements confirming that they will not distribute or misuse these trade secrets.

234.    Wettstein, as a co-owner of the Companies, was entrusted with trade secret information in the performance of her job and as a member-manager of the Companies.

235.    Wettstein improperly, maliciously, and intentionally (or, in the alternative, in bad faith), disclosed and/or used these trade secrets for the use and benefit of CW EU/VB, a competitor of the Companies.

236.    Wettstein also improperly used her position as a co-owner and member-manager of the Companies to aid and abet others in misappropriating the Companies' trade secret information by failing to shut down departing employees' email and other accounts they used to perform their duties as employees of the Companies.

237.    CW EU/VB reviewed, utilized, directed, and permitted the use of these trade secrets for its benefit, causing serious economic harm to the Companies.

238.    Wettstein utilized these trade secrets without the Companies' and Marcoux's express or implied consent, all to the Companies' detriment and to the benefit of CW EU/VB, a competitor.  CW EU/VB has endeavored to replicate CW's operations sufficient to enter the bridal market within a matter of days, including replicating CW's portal on B2Bwave.com, which could not have been accomplished without the trade secret and data theft set forth herein unless through the expenditure of months of effort and resources or the financial commitment of purchasing a competing business in arm's lengths negotiations.

239.    As a direct result of Wettstein's action set forth herein, Marcoux is entitled to damages in an amount to be proven at trial, including but not limited to damages attributable to the severe emotional distress caused by Wettstein's acts and omissions.

## COUNT VI
### Misappropriation of Trade Secrets
### Under Vermont Law 9 V.S.A. § 4601, et seq.

240.    Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

241.    Vermont law prohibits the misappropriation of trade secrets. 9 V.S.A. § 4601, et seq.

242.    Under Vermont law, a trade secret is defined as information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 9 V.S.A. § 4601(3).

243.    Vermont law defines misappropriation to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express of implied consent by a person" that "used improper means to acquire knowledge of the trade secret." 9 V.S.A. § 4601(2).

244.    Vermont law defines improper means to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 9 V.S.A. § 4601(1).

245.    The Companies' confidential and proprietary information stolen and misappropriated by Wettstein includes, among other things, training materials, employee roster and salary lists, employment and third-party contracts, business strategies, customer lists and orders, lead lists and leads, and designer contacts. In addition, CW's confidential and proprietary information that Wettstein stole and misappropriated also includes data associated with CW's custom B2Bwave.com portal.

246.    Wettstein stole and misappropriated this confidential and proprietary information through the use of improper means, as defined under Vermont law, because she was a co-owner

and member-manager of the Companies and was under a duty to maintain the secrecy of such information. Wettstein was also under a fiduciary duty to maintain the secrecy of such information that would strictly forbid her from using such confidential and proprietary information for the benefit of CW EU/VB, a competitor of the Companies.

247.    This material constitutes trade secrets under Vermont law because it would provide a competitor a significant advantage in creating a bridal agency that could compete with CW and MDB.

248.    The Companies derive independent economic value from their confidential data and trade secrets including their employee data, customer lists, pending orders, business organization and strategies, and their pricing information.

249.    The Companies take steps to protect this confidential and proprietary information by restricting employees' access, using password protected logins for certain information, and having employees sign nondisclosure agreements confirming that they will not distribute or misuse these trade secrets.

250.    Wettstein, as a co-owner of the Companies, was entrusted with trade secret information in the performance of her job and as a member-manager of the Companies.

251.    Wettstein improperly, maliciously and intentionally (or, in the alternative, in bad faith) disclosed and/or used these trade secrets, for the use and benefit of CW EU/VB, a competitor of the Companies.

252.    Wettstein also improperly used her position as a co-owner and member-manager of the Companies to aid and abet others' misappropriation of the Companies' trade secret information by failing to shut down departing employees' email and other accounts they used to perform their duties as employees of the Companies.

253.    CW EU/VB reviewed, utilized, directed, and permitted the use of these trade secrets for its benefit, causing serious economic harm to the Companies.

254.    Wettstein utilized these trade secrets without the Companies' or Marcoux's express or implied consent, all to the Companies' detriment and to the benefit of CW EU/VB, a competitor. CW EU/VB has endeavored to replicate CW's operations sufficient to enter the bridal market within a matter of days, including replicating CW's portal on B2Bwave.com, which could not have been accomplished without the trade secret and data theft set forth herein unless through the expenditure of months of effort and resources or the financial commitment of purchasing a competing business in arm's lengths negotiations.

255.    As a direct result of Wettstein's actions set forth herein, Marcoux is entitled to damages in an amount to be proven at trial.  Pursuant to 9 V.S.A. § 4603, Marcoux's damages include both the actual loss caused by Wettstein's misappropriation and the unjust enrichment caused by Wettstein's misappropriation that is not taken into account in computing actual loss.  In the alternative, Marcoux requests damages caused by the misappropriation, measured by imposition of liability for a reasonable royalty for Wettstein's unauthorized disclosure or use of a trade secret.

256.    Marcoux and the Companies have incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Wettstein's misappropriation.  As a further proximate result of the misappropriation and use of the Companies' trade secrets, Wettstein was unjustly enriched.

257.    Pursuant to 9 V.S.A. § 4603(a)(4), Marcoux further seeks an award of her costs and fees, including her reasonable attorney's fees, together with damages relating to the severe emotional distress caused by Wettstein's acts and omissions described herein.

258.     In performing the conduct set forth herein, Wettstein acted willfully and maliciously, intending to injure Marcoux and the Companies and to wrongfully obtain an advantage at Marcoux and the Companies' expense.  Pursuant to 9 V.S.A. § 4603(b), Marcoux also seeks an award of punitive damages.

## COUNT VII
### Tortious Interference with Contractual Relations

259.     Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

260.     The Companies had a valid business relationship or expectancy with the designers that signed contracts and/or entered into verbal agreements to work exclusively with CW.

261.     The Companies also had a valid business relationship or expectancy with their employees, pursuant to their employment agreements, which contained nondisclosure/confidentiality provisions as well as non-compete clauses, prohibiting employees from working with competitors for a period of time.

262.     Wettstein, as a co-owner and member-manager of the Companies, had knowledge of the relationship(s) and/or expectancy(ies) set forth above.

263.     Upon information and belief, Wettstein intentionally interfered with these contractual relationships by secretly working with designers to help them terminate their contractual relationships with CW and/or MDB so that they could immediately begin to work with Voeux Blancs, a competitor of the Companies, without Marcoux's approval or input.

264.     Wettstein further interfered with the contractual relationships the Companies had with their employees when she:

a. Instructed at least one employee for a raise at a time she knew the Companies could not afford the raises in an effort to damage the Companies' relationship with their employees;

b. Assisted and helped employees find new jobs, often working directly with former CW designers, helping the employees appropriate a corporate opportunity that rightfully belonged to the Companies and at Marcoux's expense; and

c. Without Marcoux's approval, agreed to remove or not enforce the non-compete provision in employee contracts but only for the Companies' departing employees that immediately began working for CW EU/VB, a competitor of the Companies.

265. Wettstein's acts set forth herein were ultra vires because she never received Marcoux's approval to take these actions, which actions also constituted a breach of Wettstein's fiduciary duty of loyalty that she owed both Marcoux and the Companies.

266. Upon information and belief, Wettstein's acts were taken with the deliberation and intent to damage Marcoux and the Companies to such a degree that the Companies would be bankrupt and Marcoux would have no job.

267. Wettstein's acts caused damage to Marcoux, in an amount to be proven at trial, by disrupting and interfering with the Companies' contractual relationships so that: (a) the Companies would fail, (b) Wettstein's favorite employees would be free to work directly with Voeux Blancs, a competitor of the Companies, and (c) Wettstein's favorite designers could terminate their exclusive contracts with the Companies and begin to work with Voeux Blancs.

268. Essentially, Wettstein intentionally interfered with the Companies' contractual relationships to damage Marcoux and her future employment while directly benefiting herself in her capacity as an independent contractor as well as benefiting Voeux Blancs, a competitor of the

Companies, that Wettstein helped create and start using the Companies' intellectual property, financial resources, employee labor, and other resources without Marcoux's knowledge or consent.

269. But for Wettstein's intentional acts to sabotage the Companies, Marcoux and the Companies would not have been injured.

270. By reason of Wettstein's inducement and intentional acts, Marcoux and the Companies have been damaged by the loss of the benefits they would have derived from the relationships with the designers that Wettstein let out of their contracts and by the employees who were released from the non-compete provisions in their employment agreements, and Marcoux and the Companies lost sales as a result of Wettstein's actions and seek damages and related costs in an amount to be proven at trial, including, but not limited to damages relating to the severe emotional distress caused by Wettstein's acts and omissions described herein.

## COUNT VIII
### Negligence

271. Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

272. Wettstein never resigned her position at Melange de Blanc but has ignored all things related to Melange de Blanc since the last market that was held in New York City, New York in October of 2024 without alerting Marcoux of her actions.

273. Marcoux has been told by numerous clients that Wettstein has "ghosted them" or "ignored all forms of contact", whether by phone or email, which has cost the Companies thousands of dollars as well as allowed unnecessary rumors to spread through the industry and weaken the brand name they once had.

274. Upon information and belief, Wettstein did not acknowledge the upcoming New York Bridal Market or the upcoming Milan, Italy Market, both in April 2025 by not pre-booking

and securing spaces, which historically was done by Wettstein, as an employee of MDB, to ensure a successful and profitable market season.

275.    Wettstein was in talks with another company to sell Melange de Blanc and planned a trip to do more in-person negotiations without Marcoux's knowledge, consent or approval.

276.    Essentially, Wettstein intentionally interfered with the Companies' contractual relationships to damage Marcoux and the potential sale of MDB to two or more potential buyers.

277.    As an owner and employee of MDB, Wettstein owed MDB and Marcoux a duty of care to continue to diligently perform her duties for the benefit of MDB.

278.    Wettstein breached her duty by failing to make any plans for the upcoming New York Bridal Market or the upcoming Milan, Italy Market, both of which are in April 2025.

279.    Wettstein further breached her duty when she failed to keep Marcoux informed about potential negotiations to sell MDB and by acting on behalf of MDB without Marcoux's consent or approval.

280.    But for Wettstein's intentional and negligent acts to sabotage Melange de Blanc, Marcoux and CW, the Companies and Marcoux would not have been injured.

281.    As a direct result of Wettstein's actions set forth herein, Marcoux is entitled to damages in an amount to be proven at trial, including, but not limited to, damages relating to the severe emotional distress caused by Wettstein's acts and omissions described herein.

## COUNT IX
### Negligent Infliction of Emotional Distress

282.    Plaintiff repeats and re-alleges the allegations set forth in the paragraphs above as if fully set forth herein.

283.    As set forth above, Wettstein has a relationship with Marcoux that necessarily implicates Marcoux's emotional well-being, as 50-50 owners of MDB and CW.

284.    Wettstein has undertaken an obligation to benefit Marcoux as her partner and 50-50 owner of MDB and CW, and Wettstein undertook her obligations in a manner, as set forth in more detail above, that created an especially likely risk that Wettstein's negligent performance of the obligations would cause Marcoux severe emotional distress.

285.    For example, Wettstein should have known that her actions described in Paragraphs 185-196 above, as well as other actions set forth herein, were likely to cause Marcoux severe emotional distress and mental anguish.

286.    Upon information and belief, Wettstein's actions described in Paragraphs 185-196 above, as well as other actions set forth herein, were taken by Wettstein with the intent to cause Marcoux emotional distress and anxiety.

287.    As a direct and proximate result of Wettstein's actions described in paragraphs 200-211 above, as well as other actions set forth herein, Marcoux has suffered extreme emotional distress, mental anguish and anxiety.

288.    As set forth above, Wettstein's acts and omissions have caused Marcoux to be prescribed medication and she has been receiving treatment from both a therapist and doctor for the emotional distress, mental anguish and anxiety that Wettstein caused.

289.    As a direct and proximate result of Wettstein's intentional or negligent infliction of emotional distress, Marcoux is entitled to damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff prays for the following relief:

A.    Compensatory damages in an amount to be proven at trial, including emotional distress damages caused by Wettstein's acts and omissions;

B.    Punitive damages pursuant to 9 V.S.A. § 4603(b) and generally due to Wettstein's intentional, malicious and bad faith conduct;

56

C. An Order resulting in Christina Wettstein's dissociation from CW and MDB pursuant to 11 V.S.A. § 4081(5), while requiring her to retain liability for any of the Companies' debts relating to her improper acts;

D. An Order requiring Christina Wettstein to reimburse Plaintiff, CW and MDB for any compensation she received after she breached the fiduciary duty of loyalty she owed to Plaintiff, CW and MDB;

E. Award Plaintiff her reasonable attorney's fees and costs; and

F. CWEU/VB be dissolved and barred from selling in the States.

G. Such other and further relief as this Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 31, 2025

PRIMMER PIPER EGGLESTON & CRAMER PC

By:    /s/ Jeremy S. Grant
       Jeremy S. Grant
       30 Main Street, Suite 500
       P.O. Box 1489
       Burlington, VT 05402-1489
       Jgrant@primmer.com

       *Attorneys for Plaintiff Kimberly Marcoux*
