UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2025 DEC 22  PM 3:47**

CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| KIMBERLY MARCOUX, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 2:25-cv-00309 |
| | ) |
| CHRISTINA WETTSTEIN, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS
(Doc. 12)

Plaintiff Kimberly Marcoux is a resident of Essex Junction, Vermont, and Defendant Christina Wettstein is a resident of San Antonio, Texas. This action arises out of Plaintiff's and Defendant's joint ownership of two Vermont domestic limited liability companies ("LLCs"), Coterie White LLC ("CW") and Melange de Blanc LLC ("MDB"). In her complaint filed on March 13, 2025 (the "Complaint"), Plaintiff asserts claims for breach of fiduciary duty (Count I), disgorgement of defendant's compensation (Count II), unjust enrichment (Count III), judicial dissociation (Count IV), misappropriation of trade secrets under 18 U.S.C. § 1836 and 9 V.S.A. § 4601 (Counts V and VI), tortious interference with contractual relations (Count VII), negligence (Count VIII), and negligent infliction of emotional distress (Count IX). (Doc. 8.)

Pending before the court is Defendant's May 6, 2025 motion to dismiss Plaintiff's claims for failure to state a claim. (Doc. 12.) Plaintiff opposed the motion on June 30, 2025. (Doc. 19.) Oral argument was held on July 14, 2025, at which time the court took the pending motion under advisement.

Plaintiff is represented by Jeremy S. Grant, Esq. Defendant is represented by Anthony L. Bamrick, Esq., and Evan K. Barquist, Esq.

## I.    Allegations in the Complaint.

In 2018, Plaintiff and Defendant agreed to form CW, a bridal sales agency which was incorporated in North Carolina on January 3, 2019. An operating agreement for CW ("Operating Agreement") was drafted, but was not signed or dated. Although unsigned and undated, Plaintiff and Defendant both "acknowledged that the operating agreement for CW . . . was effective, and they acted in accordance with that understanding." (Doc. 8 at 2, ¶ 10.) The Operating Agreement provides that the LLC will be managed by its members and identified Plaintiff and Defendant as the only members. It states that it "will be construed and enforced in accordance with the laws of the state of North Carolina." (Doc. 8-2 at 11.) In 2020, Plaintiff and Defendant formed MDB, which operates "pop-up bridal markets[.]" (Doc. 8 at 4, ¶ 26.) MDB was incorporated in North Carolina on January 21, 2021. It has no operating agreement.

At some point after CW's and MDB's formation, Defendant moved to Texas and Plaintiff moved to Vermont. CW and MDB (collectively, "the Companies") were incorporated in Vermont as Vermont domestic limited liability companies on September 13, 2022 and September 19, 2022, respectively. *See id.* at 2, ¶¶ 12-13; Docs. 8-2, 8-3.

CW works with bridal designers and brands "to provide comprehensive services," including sales, customer service, billing, distribution, brand development, and general business consulting. (Doc. 8 at 3, ¶ 20.) MDB operates pop-up markets twice a year during bridal fashion weeks held in New York City, and occasionally at other locations in the United States as well as in Milan, Italy.

Plaintiff and Defendant "both represented designers, held production calls, [managed] billing, [provided] customer service, and worked closely with their team members to train them and help build their target lists." *Id.* at 5, ¶ 39. Defendant "focused more on the big picture and had a larger role in [MDB] while [Plaintiff] did more of the day-to-day tasks, especially in shipping and distribution." *Id.* at ¶ 41.

In early 2022, Plaintiff and Defendant planned to expand CW and MDB internationally. They discussed creating a new entity, Coterie White Europe ("CW EU"), to provide services in Europe. In February 2023, Plaintiff and Defendant attended a

2

training at the annual sales summit of Global Bridal House, a company they worked with based in Europe, where they met Lize and Nic Erasmus. In April 2023, Plaintiff and Defendant "decided to solidify their future plans to expand CW and MDB beyond the United States." *Id.* at 6, ¶ 51. At approximately the same time, Ms. Erasmus, Mr. Erasmus, and Peter Dierckx, a design house owner, expressed interest in joining CW and becoming part of its business in Europe. In November 2023, while attending a summit in Paris, "[Ms.] Erasmus and two employees . . . were trained on CW's B2B Wave Portal and the Companies' systems and processes." *Id.* at 7, ¶ 54. Plaintiff "expressed her concern to [Defendant] that the Companies were handing over such important and sensitive information about their operations without contracts or non-disclosure agreements[,]" but Defendant "brushed off [her] concerns." *Id.* at 7, ¶ 55-56.

On December 22, 2023, Plaintiff was seriously injured in a hit-and-run collision and suffered a traumatic brain injury. Plaintiff attempted to return to work but became "very ill." (Doc. 8 at 7, ¶ 60.) She agreed with Defendant that she would take medical leave for January and the beginning of February 2024. During Plaintiff's medical leave, Defendant "began to demand that [Plaintiff] inform her [of] a date she could return to work," which Plaintiff could not provide because of the unpredictability of her condition. *Id.* at 8, ¶ 63. Defendant "would routinely yell at [Plaintiff] for not working or contributing," causing Plaintiff anxiety and making her feel pressured to return to work. *Id.* at ¶ 64. Plaintiff sought counseling and was "prescribed anti-anxiety medicine to deal with [Defendant's] hostile behavior." *Id.* at ¶ 66. Against medical advice, Plaintiff began working part time during her medical leave.

By 2023, CW had ten employees and five million dollars in sales. It projected ten to thirteen million dollars in sales by the end of 2024. "However, due to [Defendant's] actions, CW only grossed 40% of its projected sales in 2024." *Id.* at 5, ¶ 37.

In April 2024, Plaintiff traveled to attend a MDB market and became "very sick" as her brain injury made her sensitive to bright lights, causing her to "experience[] vomiting, vision loss, and headaches." *Id.* at 9, ¶ 72. Her medical team instructed her not to work during May and June of 2024, and Plaintiff and Defendant agreed Plaintiff

"would be provided up to three months' of leave." (Doc. 8 at 9, ¶ 75.) In June, Defendant "unilaterally decided . . . to remove [Plaintiff] from the mid-month payroll[.]" *Id.* at ¶ 77. She told Plaintiff "that she could no longer afford paying [Plaintiff] and would no longer pay [Plaintiff] because [Plaintiff] was on medical leave and not contributing to the Companies[,]" but at the same time "began to pay herself large commission checks, even though [Defendant] and [Plaintiff] had agreed not to take commissions until after they had paid off a loan." *Id.* at ¶ 78-79. "Although [Defendant] was responsible for making payments to team members for commissions and salaries, [Defendant] failed to pay [Plaintiff] any commissions that she earned until after [Plaintiff] returned from medical leave on or about July 1, 2024." *Id.* at 10, ¶ 80. Plaintiff alleges that, during this same time period, Defendant shared Plaintiff's medical information with employees and customers "in an effort to make [Plaintiff] look bad[,]" telling one client that Plaintiff "would not be able to work effectively upon her return[.]" *Id.* at ¶¶ 84-85.

Plaintiff told Defendant that she would begin "easing back" into work on July 1, 2024. *Id.* at ¶ 86. Plaintiff also "offered to move to Texas to be closer to [Defendant,]" something they had previously discussed. (Doc. 8 at 10, ¶ 86.) Defendant responded by "yell[ing] at [Plaintiff], asserting that [Plaintiff] was not needed anymore, she was too late, and that [Defendant] had already built a team, so [Plaintiff] should not move to Texas for her." *Id.* at 11, ¶ 87. Defendant told Plaintiff that "it was time for them to go their separate ways," and demanded Plaintiff "sell her share of the Companies within days[.]" *Id.* at ¶ 88. Jay Cox, an accounting consultant for the Companies, "offered himself as a 'mediator' to negotiate between the business partners." *Id.* at 24, ¶ 172. Mr. "Cox repeatedly told [Plaintiff] that if she did not accept [Defendant's] offer to buy her out of the Companies for a total of $75,000, [Defendant] would destroy the Companies." *Id.* at ¶ 173. Because Defendant failed to keep Plaintiff informed regarding the Companies' financials, Plaintiff lacked the necessary information to decide whether to sell. Plaintiff believed Mr. Cox's statement to be "hyperbolic[,]" *id.* at ¶ 174, and, based on her previous experiences with Defendant, she expected this altercation to "blow over quickly[.]" (Doc. 8 at 11, ¶ 89.)

4

Plaintiff proceeded to email and text CW and MDB employees to inform them she was returning from leave and "ask for updates, passwords[,] and other information so she could transition back into her role as smoothly as possible." *Id.* at ¶ 90. The employees "did not properly respond to her requests." *Id.* at ¶ 91. During Plaintiff's medical leave, Defendant hired new staff without Plaintiff's approval and did not introduce them to Plaintiff. When she returned to work, Plaintiff noticed that the staff appeared to be under the impression she had no authority and that Defendant was the only "boss[.]" *Id.* at ¶ 93. Plaintiff alleges Defendant "intentionally created this dynamic to further her efforts to end her partnership with [Plaintiff and] . . . appropriate the CW EU opportunity all for herself." *Id.* at 12, ¶ 95. Upon Plaintiff's return to work, Defendant refused to respond to Plaintiff's business requests and questions.

Before or during Plaintiff's medical leave, Defendant decided to move forward with creating a CW EU entity without Plaintiff, using the Companies' "resources, funds, employees and contractors" to do so, "all without [Plaintiff's] knowledge, consent or approval." *Id.* at ¶ 98. Without discussing it with Plaintiff, Defendant "brought [Ms.] Erasmus on board to effectively replace [Plaintiff] as her partner." (Doc. 8 at 12, ¶ 99.) Defendant "provided [Ms.] Erasmus, [Mr.] Erasmus, and [Mr.] Dierckx (as well as his son Dylan Dierckx), with unrestricted access to all of CW and MDB's intellectual property, confidential information, company files, the B2B portal, . . . and other systems and processes of the Companies without any NDA's in place and without [Plaintiff's] knowledge, consent[,] or approval." *Id.* at 12-13, ¶ 101. Defendant announced a partnership with Ms. Erasmus and the launch of CW EU on the CW Instagram account and in emails to CW's client base, "using CW copyright protected images without [Plaintiff's] consent or approval, even though there was no contract between [Ms.] Erasmus and the Companies[.]" *Id.* at 13, ¶ 102.

Plaintiff expressed concern about being excluded from discussions about CW EU, but Defendant told Plaintiff not to worry because there was no written contract with Ms. Erasmus. Plaintiff consulted with the Companies' lawyer who "told her that no contracts had been drafted at [Defendant's] insistence, and that if either of the Companies

expanded into Europe, [Plaintiff] would be a beneficiary and they would create an operating agreement." *Id.* at ¶ 105.

Defendant "falsely informed [Plaintiff] that she was not pursuing CW EU and nothing was happening with that idea because she did not want to 'deal with' [Plaintiff's] alleged drama." *Id.* at ¶ 104. Yet Defendant "create[d] a new entity, Voeux Blancs [("VB")] to pursue the CW EU plan, appropriating [corporate resources and] a corporate opportunity from the Companies[.]" *Id.* at 13-14, ¶ 106. "[O]n one occasion, [Ms.] Erasmus stated that she was taking funds out of [CW] EU's bank account and [Defendant] consented, without [Plaintiff's] knowledge, consent[,] or approval." (Doc. 8 at 15, ¶ 108.)

Defendant instructed those involved in the project not to inform Plaintiff of their work on VB in order to conceal her actions from Plaintiff. Defendant and those working with her on VB used CW email accounts to establish and plan for CW EU and VB. For example, CW email accounts were used "to set up a CW EU PayPal account, develop a CW EU business plan, . . . and otherwise create plans, processes[,] and procedures for CW EU[ and/or ]VB[.]" *Id.* at 14, ¶ 110. Defendant eventually told Plaintiff that Ms. Erasmus, Mr. Erasmus, and Mr. Dierckx "did not want her involved in the CW EU plan," which Defendant intended to be jointly owned by herself, Ms. and Mr. Erasmus, and Mr. Dierckx. *Id.* at ¶ 111.

On July 20, 2024, Defendant offered to buy Plaintiff's interests in the Companies for $70,000 and gave Plaintiff six days to accept this offer. At this time, Defendant "was restricting [Plaintiff's] access to important financial information regarding the Companies" and refused to extend the offer to allow Plaintiff to obtain an expert appraisal of the Companies' value. *Id.* at 15, ¶ 119. Plaintiff did not respond to Defendant's offer, at which time Defendant resigned from CW, but not MDB.

Since July 26, 2024, Defendant has "devoted a significant amount of her time and effort to CW EU[ and/or ]VB, a competing business[.]" *Id.* at ¶ 120. Defendant has actively undermined the Companies by encouraging CW clients to terminate their contracts with CW; depleting CW and MDB's accounts with excessive spending;

facilitating employees' termination of their exclusive employment agreements; using

CW's and MDB's confidential information and trade secrets to compete with CW and

MDB; and withholding critical operational and financial information from Plaintiff, as

well as other actions Plaintiff alleges breached Defendant's duty of loyalty to her and the

Companies. Upon gaining entry to CW EU's and VB's portal on or about August 15,

2024, Plaintiff "ran a report that showed CW EU[ and/or ]VB had roughly $500,000.00

in sales – sales that otherwise would have and should have gone to CW but for

[Defendant's] improper acts." *Id.* at 17, ¶ 122.

    In August 2024, "six of CW's most lucrative clients" informed Plaintiff that they

were ending their relationship with CW effective immediately. (Doc. 8 at 19, ¶ 134.)

Defendant initially asked Plaintiff to help off-board these clients but then began to do so

herself, withholding information related to the off-boarding terms from Plaintiff. Several

CW employees also resigned at the end of August 2024. One of CW's remaining

employees told Plaintiff that, while Plaintiff was on medical leave, Defendant used CW

employees to help create CW EU and/or VB and advised the employee to leave CW,

offering to help the employee find a new job.

    On September 15, 2024, a retailer forwarded Plaintiff an email announcing the

creation of VB and asked Plaintiff "if she had started a new agency as the branding and

name felt familiar and similar to [CW] and the [MDB] brand." *Id.* at 21, ¶ 150. Plaintiff

called Defendant, and Defendant insulted Plaintiff "with statements such as 'no one likes

you,' 'see how all your employees quit,' [and] 'no one wants to work with you.'" *Id.* at

¶ 152. Plaintiff alleges that Defendant's abusive behavior has caused her "severe

emotional and physical harm, including a diagnosis of PTSD and anxiety, which her

therapist and doctor have attributed to [Defendant's] actions." *Id.* at 37, ¶ 195.

    Plaintiff asserts that CW EU and VB are the same entity and that the name VB

was adopted to distinguish it from the Companies. The email announcing VB's creation

was sent to retailers and stated that all their information and CW order history were

transferred to their VB B2B Wave Portal. Plaintiff "received emails from retailers who

did not work with or buy VB's brands but were still somehow added to VB's portal

without their permission[]" expressing confusion "because the emails they received referenced VB's logo and VB's portal but had a CW email account . . . at the bottom of the email and included their CW order ID numbers." *Id.* at 22, ¶ 159-60.

Although Defendant has not resigned her position at MDB, she "has ignored all things" related to the company since October 2024. *Id.* at 54, ¶ 272. Defendant attended MDB's October 2024 market but spent her time focused on VB clients. Plaintiff alleges that "numerous clients" have told her that Defendant "has 'ghosted them' or 'ignored all forms of contact[,]'" costing the Companies "thousands of dollars" and damaging the Companies' reputations. (Doc. 8 at 54, ¶ 273.)

Plaintiff seeks:

A. Compensatory damages in an amount to be proven at trial, including emotional distress damages caused by [Defendant's] acts and omissions;

B. Punitive damages pursuant to 9 V.S.A. § 4603(b) and generally due to [Defendant's] intentional, malicious[,] and bad faith conduct;

C. An Order resulting in [Defendant's] dissociation from CW and MDB pursuant to 11 V.S.A. § 4081(5), while requiring her to retain liability for any of the Companies' debts relating to her improper acts;

D. An Order requiring [Defendant] to reimburse Plaintiff, CW[,] and MDB for any compensation she received after she breached the fiduciary duty of loyalty she owed to Plaintiff, CW[,] and MDB;

E. Award Plaintiff her reasonable attorney's fees and costs; []

F. CW[ ]EU[ and/or ]VB be dissolved and barred from selling in the States[; and]

G. Such other and further relief as this Court deems just and proper."

*Id.* at 56-57.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

To survive a motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible[.]" *Twombly*,

8

550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The sufficiency of a plaintiff's complaint under Rule 12(b)(6) is evaluated using a "two-pronged approach[.]" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679). First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. The court is also "'not bound to accept as true a legal conclusion couched as a factual allegation[.]'" *Id.* (citation omitted). Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.*

In reviewing a complaint, a court must "accept as true the material facts alleged in the complaint and draw all reasonable inferences in plaintiffs' favor." *Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015) (alterations adopted) (internal quotation marks and brackets omitted). The court does not "weigh the evidence" or "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017).

**B.      Whether North Carolina or Vermont Law Governs Counts I-VII.**

Defendant contends that North Carolina law applies to Claims I-VII because the Operating Agreement governs the business relationship between Defendant and Plaintiff and includes a choice-of-law clause that states the Operating Agreement is governed by North Carolina law. Plaintiff asserts that Vermont law applies because Plaintiff and Defendant reincorporated the Companies in Vermont, after which the Operating Agreement no longer applied and all the alleged misconduct occurred. Defendant concedes that Vermont law governs Counts VIII and IX as "torts are presumably outside the scope of the parties['] Operating Agreement, thus governed by the law of the forum." (Doc. 12 at 8.) This is consistent with the Restatement (Second) of Conflict of Laws

9

§ 145, which applies "the local law of the state which, with respect to [an] issue, has the most significant relationship to the occurrence and the parties" as determined by where the injury and the conduct causing the injury occurred, the domicile and residence of the parties, and "the place where the relationship, if any, between the parties is centered." Plaintiff's factual allegations relating to negligence and negligent infliction of emotional distress concern conduct that took place in Vermont.

The threshold question of whether the Operating Agreement was in full force and effect during the events alleged in the Complaint is one that cannot be resolved at the pleading stage. Contrary to Defendant's contention, Plaintiff does not allege that the Operating Agreement controls her business relationship with Defendant, even though Plaintiff acknowledges that MDB had no operating agreement and that CW had an operating agreement that "was effective" after CW's incorporation in North Carolina on January 3, 2019. (Doc. 8 at 2, ¶ 10.) Thereafter, CW and MDB were reincorporated in Vermont. The Complaint does not allege whether Plaintiff and Defendant intended the Operating Agreement to remain in effect after the Companies' reincorporation as Vermont domestic LLCs in September 2022. Drawing all reasonable inferences in Plaintiff's favor, CW and MDB were Vermont LLCs at the time of the events alleged in the Complaint and were not governed by the Operating Agreement. At the pleading stage, Vermont law therefore applies.

A court sitting in diversity "look[s] to the laws of the forum state in deciding issues regarding conflicts of law." *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015) (internal quotation marks omitted) (citing *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006)); *see also Bigio v. Coca-Cola Co.*, 675 F.3d 163, 169 (2d Cir. 2012) ("In cases where jurisdiction is based on the diversity of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state[.]") (citation omitted). Under Vermont law, "[t]he threshold question in choice-of-law analysis is whether a conflict exists." *Rodrigue v. Illuzzi*, 2022 VT 9, ¶ 13, 216 Vt. 308, 317, 278 A.3d 980, 986. Vermont courts "avoid choice-of-law questions where application of laws of both jurisdictions would produce same result." *Id.* (citing *Havill v.*

10

*Woodstock Soapstone Co.*, 783 A.2d 423, 427 (Vt. 2001)).

Defendant, as the proponent of non-Vermont law, "bears the burden of demonstrating that [North Carolina] law conflicts with Vermont law." *In re Ambassador Ins. Co.*, 2022 VT 11, ¶ 17, 216 Vt. 255, 262, 275 A.3d 122, 127 (citation omitted). If there is a conflict, the Vermont Supreme Court "has adopted the Restatement (Second) of Conflicts for choice-of-law questions in both tort and contract cases." *McKinnon v. F.H. Morgan & Co.*, 750 A.2d 1026, 1028 (Vt. 2000). Section 187 of the Restatement provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement (Second) of Conflict of Laws § 187(1) (1971). "Whether the parties could have determined a particular issue by explicit agreement directed to that issue is a question to be determined by the local law of the state selected by application of the rule of § 188." *Id.* at cmt. c.

"[T]he rule of § 188[,]" *id.*, "essentially asks [the court] to consider several factors to determine which state has the most significant relationship to the . . . contract." *In re Ambassador Ins. Co.*, 2022 VT 11, ¶ 15, 216 Vt. at 262, 275 A.3d at 126 (citing *Martineau v. Guertin*, 751 A.2d 776, 778 (Vt. 2000)). Relevant factors include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties[,]" which must be "evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws § 188(2).

In this case, the Operating Agreement was drafted and negotiated in North Carolina, although it remained undated and unsigned. The Vermont Supreme Court has held that the contracting parties' intent is a question of fact and that, in the absence of a fully executed contract, such intent can be shown through "oral testimony, correspondence, or other initial or partially complete writings." *Catamount Slate Prods., Inc. v. Sheldon*, 2003 VT 112, ¶ 17, 176 Vt. 158, 164, 845 A.2d 324, 329 (citation omitted). North Carolina law does not require a written operating agreement, N.C. Gen.

11

Stat. § 57(D)-1-03(23) ("[T]he operating agreement may be in any form, including written, oral, or implied, or any combination thereof"), but when the statute of frauds applies, "the contract shall be in writing[] and signed by the party to be charged therewith." *Durham Consol. Land & Improv. Co. v. Guthrie*, 21 S.E. 952, 953 (1895) (internal quotation marks omitted); *see also N.C. State Bar v. Merrell*, 777 S.E.2d 103, 114 (N.C. Ct. App. 2015) ("An operating agreement is a contract[.]").

Since September of 2022, when the Companies were reincorporated in Vermont, and when the conduct alleged in the Complaint took place, the performance and the location of the subject matter of the parties' agreement was in Vermont. Other agreements governing the partners' relationships were also allegedly negotiated and executed in Vermont. On balance, these factors weigh in favor of a Vermont forum having the most significant relationship to the contract, and thus Vermont law applies to determine if a particular issue could have been resolved by explicit agreement.

"[E]ven if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue," their choice of law will govern unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2).

The court must "conduct the choice-of-law analysis separately for each of the Plaintiff['s] claims." *Bigio*, 675 F.3d at 169 (citing *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 383 (2d Cir. 2006)); *see also Miller v. White*, 702 A.2d 392, 394 (Vt. 1997) ("We emphasize that the Restatement (Second) calls for an issue-by-issue determination of choice-of-law questions. Thus, it is possible that within one case, the law of one jurisdiction will apply to one issue and the law of another jurisdiction to another issue.").

Because the court cannot find as a matter of law that the choice-of-law provision in the undated and unsigned Operating Agreement governs Plaintiff's contractual claims, especially as the parties do not apparently agree on whether the Operating Agreement was effective, for purposes of ruling on Defendant's motion to dismiss, the court applies Vermont law while noting where North Carolina law dictates a different outcome.

## C.    Whether Plaintiff Has Pled Facts to Allow Derivative Claims to Proceed Directly.

Defendant argues that many of Plaintiff's claims are impermissibly pled as direct claims when they actually belong to the Companies. Plaintiff responds that, to the extent any of her claims are improperly brought as direct instead of derivative claims, the court should grant her leave to bring the claim directly. She cites a New Hampshire Supreme Court case holding that "where the principles underlying the derivative proceeding are not served, the trial court should have the discretion to allow the plaintiff to pursue a direct claim against the corporate officers." *Durham v. Durham*, 871 A.2d 41, 46 (N.H. 2005). The New Hampshire Supreme Court identified four purposes served by derivative actions: (1) avoid multiple lawsuits by shareholders; (2) protect corporate creditors by returning recoveries to the company; (3) safeguard the interests of all shareholders rather than just the single shareholder who brought the suit; and (4) compensate the injured shareholder by increasing the value of his or her share.

Plaintiff contends that, in this case, the purposes of a derivative suit would not be served because there are no corporate creditors who require protection and because Plaintiff and Defendant are the Companies' only members. As a result, there is no risk of multiple lawsuits or a concern that other members would be prejudiced. If Plaintiff is required to bring her claims derivatively on the Companies' behalf, Defendant would recover as a member of the Companies. The court need not address this argument because Defendant fails to cite Vermont law that would require dismissal of all derivative

13

claims.[1]

### D.    Whether the Complaint States a Claim for Breach of Fiduciary Duty (Count I).

#### 1.    Under Vermont Law.

Under 11 V.S.A. § 4059, members of member-managed LLCs and managers of

manager-managed LLCs owe a duty of loyalty to the LLC and its members as follows:

> (1) to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of the company's opportunity;
>
> (2) to refrain from dealing with the company in the conduct or winding up of the company's business as or on behalf of a party having an interest adverse to the company; and
>
> (3) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.

11 V.S.A. § 4059(b).

The statute allows an LLC member to "maintain a direct action against another

member, a manager, or the [LLC] to enforce the member's rights and protect the

member's interests, including rights and interests under the operating agreement, under

---

[1] "The general principles governing shareholder suits are well settled." *Bovee v. Lyndonville Sav. Bank & Tr. Co.*, 811 A.2d 143, 145 (Vt. 2002). "To have standing to sue individually, the shareholder must allege an injury separate and distinct from other shareholders, or a wrong involving a contractual right of the shareholder that exists independently of any right of the corporation." *Id.* at 145-46 (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351 (Del. 1988)). "In *Bovee*, the Vermont Supreme Court cited Delaware law which holds that a court should examine '[w]ho suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy[.]'" *Qureshi v. People's United Bank*, 2020 WL 2079922, at *18 (D. Vt. Apr. 30, 2020) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004)). "[T]he operative test is not whether [p]laintiffs each suffered a direct loss; instead the 'test requires the court to compare the individual plaintiff's alleged injury to injuries suffered by the other members or shareholders of the company and then determine whether the plaintiff's injury is separate and distinct from other members or shareholders.'" *Id.* (quoting *Triton II, LLC v. Randazzo*, 2019 WL 1777726, at *7 (S.D. Fla. Apr. 23, 2019)). "Indeed, if the only injury to an investor is the indirect harm which consists of the diminution in the value of his or her investment, the suit must be derivative." *Id.* (alteration adopted) (internal quotation marks omitted) (quoting *In re Goldman Sachs Mut. Funds*, 2006 WL 126772, at *6 (S.D.N.Y. Jan. 17, 2006)).

this title, or arising independently of the membership relationship[,]" although "[a] member who maintains a direct action under this section must prove an actual or threatened injury to the member that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." 11 V.S.A. § 4131.

Whether a fiduciary duty exists between parties "is a question of law to be decided by the court." *McGee v. Vt. Fed. Bank, FSB*, 726 A.2d 42, 44 (Vt. 1999). "Generally, in order for a fiduciary duty to exist, the relationship between the parties must have ripened into one in which one party was dependent on, and reposed trust and confidence in the other party in the conduct of its affairs." *Ascension Tech. Corp v. McDonald Invs.*, 327 F. Supp. 2d 271, 276 (D. Vt. 2003) (alterations adopted) (internal quotation marks omitted) (citing *McGee*, 726 A.2d at 44); *see also Cooper v. Cooper*, 783 A.2d 430, 436 (Vt. 2001) ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.") (internal quotation marks omitted). The Complaint alleges that Defendant was a member-manager of the Companies with a duty of loyalty to Plaintiff under 11 V.S.A. § 4059. Under Vermont law, Plaintiff has thus plausibly pled that Defendant owed her a fiduciary duty for the purpose of her breach of fiduciary duty claim.

The Vermont Supreme Court has not decided whether 11 V.S.A. § 4131's requirement that a member "prove an actual or threatened injury . . . that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company" imposes a greater burden than the requirement of an individualized injury. Other courts, applying state statutes with similar language, "have held that a plaintiff possesses standing to bring an action against another member of the LLC when the member sought to harm the plaintiff individually by rendering their interest in the LLC worthless; . . . when the defendant fails to provide financial and other records relating to the LLC; . . . and when the defendant allegedly failed to make payments due to the plaintiff[.]" *Vic's Montowese Pizzeria, LLC v. Kwieraga*, 2023 WL 6575752, at *10 (Conn. Super. Ct. Oct. 5, 2023) (collecting cases from Connecticut state trial courts) (internal citations omitted);

*see also Fratelli BVBA v. APM Music Servs., LCC*, 2021 WL 4429417, at \*9 (S.D.N.Y. Sept. 27, 2021) (finding that LLC member "suffered a unique injury" based on allegation that another member "allegedly diverted over \$25,000 that should have gone to" him).

Because Plaintiff alleges that Defendant withheld payments from her, prevented her from accessing company accounts and records, refused to provide her with the Companies' financial information, competed with the Companies, used the Companies' resources to advance her own interests, and lured away customers, thereby diminishing the value of Plaintiff's financial investment in the Companies, Plaintiff has pled "an actual or threatened injury . . . that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company" within the meaning of 11 V.S.A. § 4131.

## 2.    Under North Carolina Law.

Under the North Carolina Limited Liability Company Act ("NCLLCA"), members "do not owe a fiduciary duty to each other or to the company[,]" with the exception of a controlling shareholder, who "owes a fiduciary duty to minority shareholders." *Kaplan v. O.K. Technologies, L.L.C.*, 675 S.E.2d 133, 137 (N.C. 2009) (citation omitted). Under the NCLLCA, managers of a limited liability company "owe a fiduciary duty to the company, [but] not to individual members[]" nor other managers. *Id.* Managers of limited liability companies are therefore to be treated like directors of a corporation, and "where it is alleged that [managers] have breached [their fiduciary] duty, the action is properly maintained by the [LLC] rather than any individual [member]." *Id.* (emphasis omitted) (internal quotations and citation omitted).

The Complaint alleges that Defendant was both a member and a manager and that Plaintiff and Defendant were equal owners of the Companies. As a result, under North Carolina law, both as a manager and non-controlling member, Defendant owed Plaintiff no fiduciary duties. To the extent Plaintiff alleges a direct claim for breach of fiduciary duty against Defendant, the claim would likely be dismissed if North Carolina law applied.

16

### 3. Choice of Law.

Because the outcome is different under Vermont and North Carolina law, the court applies § 187 of the Restatement (Second) of Conflicts to resolve the choice-of-law question. Section 187(1) of the Restatement applies the parties' choice of law "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Section 187(2)(a) of the Restatement applies the parties' choice of law unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice[.]"

The chosen state of North Carolina previously had, but no longer has, a "substantial relationship" to the parties and the transaction. Plaintiff is a resident of Vermont, Defendant is a resident of Texas, and the Companies are Vermont entities. The conduct alleged occurred after the entities were reincorporated in Vermont. *See Id.* cmt. f (noting a substantial relationship exists when the state is "where performance by one of the parties is to take place or where one of the parties is domiciled or has his principal place of business"); *Kearney v. Okemo Ltd. Liab. Co.*, 2016 WL 4257459, at *4 (D. Vt. Aug. 11, 2016) (finding no substantial relationship when parties were not residents of the chosen state and the incident did not occur in the chosen state). There remains, however, a "reasonable basis" for the parties' choice of North Carolina law. *Compare BASF Corp. v. Cesare's Collision Repair & Towing, Inc.*, 364 F. Supp. 3d 1115, 1120 (E.D. Cal. 2019) (finding reasonable basis to select Michigan law when business division at issue in the contract was located in Michigan), *with Missaghi v. Coca-Cola Co.*, 2013 WL 12114765, at *3 (C.D. Cal. Jan. 2, 2013) (finding no substantial relationship or reasonable basis to select Michigan where neither party was a citizen of Michigan, the contract and the parties' briefs did not indicate why Michigan was chosen, and the choice to apply Michigan law "appear[ed] to be completely arbitrary"). In light of North Carolina's previously substantial relationship to the parties and their activities, its source of law governing the Operating Agreement is not unreasonable.

Under § 187(2)(b) of the Restatement, parties' choice of law will not be applied if the "application of the law of the chosen state would be contrary to a fundamental policy

17

of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." There is no accepted definition of a "fundamental policy," Restatement (Second) of Conflict of Laws § 187 cmt. g, beyond that it must be "substantial" and "may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." *Id.*[2]

In the instant case, applying North Carolina law would produce a result contrary to Vermont's LLC statutory scheme and would negate the application of 11 V.S.A. § 4003, which states that "an operating agreement may not[,] . . . subject to subsection (c) through (f) of this section, eliminate or restrict the duty of loyalty, the duty of care, or any other fiduciary duty[.]" 11 V.S.A. § 4003(b)(4). Subsections (c) through (f) allow for an operating agreement to "restrict" or "identify the specific types or categories of activities that do not violate the duty of loyalty[,]" but do not allow for its elimination. *Id.* at § 4003(c)(2). Application of North Carolina law in this case would therefore result in the elimination of a fiduciary duty between Plaintiff and Defendant, contrary to a substantive public policy and statutory requirement of Vermont.

Vermont also has a materially greater interest than North Carolina in the determination of the parties' disputes. The Companies are no longer North Carolina entities but, rather, are and at all relevant times were, Vermont entities, and Vermont has an interest in having its laws apply to Vermont LLCs. *See, e.g.*, *Druck Corp. v. Macro Fund (U.S.) Ltd.*, 2007 WL 258177, at *1 (S.D.N.Y. Jan. 29, 2007) ("In New York, the internal affairs doctrine recognizes that the state of incorporation has an interest superior

---

[2] Whether a disclaimer of fiduciary duties is unenforceable because it is against Vermont's public policy cannot be resolved by resort to the Operating Agreement itself. Restatement (Second) of Conflict of Laws § 187 cmt. d (noting that issues of contractual validity cannot be determined by explicit agreement). *See, e.g.*, *Wanstall v. D40 Gravel LLP Vt.*, 2025 WL 1785244, at *6 (D. Vt. Jun. 27, 2025) (holding that the enforceability of an exculpatory clause cannot be determined by resorting to the contract itself); *Kearney v. Okemo Ltd. Liab. Co.*, 2016 WL 4257459, at *4 (D. Vt. Aug. 11, 2016) (same).

18

to that of other states in regulating the directors' conduct of the internal affairs of its own corporations.") (citation omitted). Because "[f]iduciary duties are ultimately imposed for the protection of [the] person to whom the duty is owed," *Marshall v. Ameriprise Fin. Servs.*, 735 F. Supp. 3d 1229, 1239 (E.D. Cal. 2024), application of North Carolina law would deprive Plaintiff of the protection to which she would otherwise be entitled. *See id.* (finding that "[a]pplication of Minnesota law would subvert California's strong interest in imposing a fiduciary duty" when the plaintiffs were owed a fiduciary duty under California but not Minnesota law and were California residents). As Vermont law establishes fiduciary duties between LLC members and authorizes direct actions, at the pleading stage it applies, and the court DENIES Defendant's motion to dismiss Count I on the grounds that Defendant owes no fiduciary duty to Plaintiff.

### E.    Whether the Complaint States a Claim for Disgorgement of Compensation (Count II).

Plaintiff asserts a claim for disgorgement of the compensation the Companies paid Defendant during the relevant period "as a member, officer[,] or employee of CW or MDB following [Defendant's] breach of the fiduciary duty of loyalty she owed to [Plaintiff], CW, and MDB." (Doc. 8 at 41, ¶ 206.) Defendant seeks dismissal of Plaintiff's claim for disgorgement, citing North Carolina law that holds "[d]isgorgement is a remedy, not a cause of action." *Se. Anesthesiology Consultants, PLLC v. Rose*, 2019 WL 5090364, at *7 (N.C. Super. Oct. 10, 2019.) Plaintiff does not address this argument.

Disgorgement is a remedy seeking "to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." Restatement (Third) of Restitution and Unjust Enrichment § 51(4). *See also Disgorgement, Black's Law Dictionary* (12th ed. 2024) (defining disgorgement as "[t]he act of giving up something (such as profits illegally obtained) on demand or by legal compulsion"). The court agrees that, under both Vermont and North Carolina law, disgorgement is a remedy, not an independent cause of action. The court therefore GRANTS Defendant's motion to dismiss Count II. This does not preclude Plaintiff from seeking disgorgement as a remedy for any claim for which it is appropriate.

19

**F.     Whether the Complaint States a Claim for Unjust Enrichment (Count III).**

Defendant argues that Plaintiff lacks standing to bring an unjust enrichment claim because she "has not alleged that Defendant used or misappropriated any funds or assets personally belonging to Plaintiff." (Doc. 12 at 6.) Plaintiff counters that her unjust enrichment claim is properly pled as a direct claim because she alleges injuries separate and distinct from those suffered by the Companies, such as Defendant's use of the Companies' "assets and relationships to form a competing business while intentionally excluding [Plaintiff]" which "harmed [Plaintiff] individually by depriving her of profits, control, and rights as a co-equal member." (Doc. 19 at 15.)

Under Vermont law, "[a] claim of unjust enrichment requires three showings: '(1) a benefit was conferred on the defendant; (2) the defendant accepted the benefit; and (3) the defendant retained the benefit under such circumstances that it would be inequitable for the defendant not to compensate [the] plaintiff for its value.'" *Hirchak v. Hirchak*, 2024 VT 81, ¶ 26, 331 A.3d 1051, 1064 (alterations adopted) (quoting *Beldock v. VWSD, LLC*, 2023 VT 35, ¶ 68, 218 Vt. 144, 176, 307 A.3d 209, 233).

Under North Carolina law, "[a] claim for unjust enrichment 'is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law.'" *Krawiec v. Manly*, 811 S.E.2d 542, 552 (N.C. 2018) (quoting *Booe v. Shadrick*, 369 S.E.2d 554, 556 (N.C. 1988)). "In order to establish a claim for unjust enrichment, a party must have conferred a benefit on the other party and the benefit must not be gratuitous and it must be measurable." *Id.* (internal quotation marks and citation omitted).

Although Plaintiff alleges individual injury in this case, her unjust enrichment claim is based solely on Defendant's retention of benefits conferred by the Companies, including the use of their business records and opportunities. She does not allege that she,

20

herself, conveyed a benefit on Defendant which Defendant unjustly retained.[3] *See Sellers v. Morton*, 661 S.E.2d 915, 923 (N.C. App. 2008) (finding plaintiff did not confer a benefit on the LLC officers, directors, and shareholders by entering into an employment and consulting contract with the LLC). Even if it would be inequitable for Defendant to retain the Companies' benefits, Plaintiff has not plausibly alleged unjust enrichment under Vermont or North Carolina law. The court therefore GRANTS Defendant's motion to dismiss Count III.

### G.    Whether the Complaint States a Claim for "Judicial Dissociation" of Defendant (Count IV).

In Count IV, Plaintiff alleges she is entitled to seek dissociation of Defendant from the Companies for Defendant's wrongful conduct that has adversely and materially affected the Companies. Defendant argues that neither North Carolina law nor the Operating Agreement provides "a mechanism to judicially oust a single LLC member as Plaintiff seeks to do here." (Doc. 12 at 6.)

"Dissociation" is defined as "a complete termination of a member's continued membership in a[n LLC] for any reason." 11 V.S.A. § 4001(7). Under 11 V.S.A. § 4081, an LLC member may be ousted by judicial determination "on application by the company or another member" when the LLC member:

(A) engaged in wrongful conduct that has adversely and materially affected, or will adversely and materially affect, the company's business;

(B) willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under section 4059 of this title; or

(C) engaged in conduct relating to the company's business which makes it not reasonably practicable to carry on the business with the person as a member;

11 V.S.A. § 4081(5).

---

[3] *See* Doc. 8 at 43, ¶ 215-16 ("A benefit was conferred on [Defendant] when she used the *Companies'* funds, without [Plaintiff's] consent, knowledge[,] and approval . . . . A benefit was further conferred on [Defendant] when she used the *Companies'* funds, employees, intellectual property, confidential information, and trade secrets, without [Plaintiff's] consent, knowledge[,] or approval[.]") (emphasis supplied).

The North Carolina Limited Liability Act provides a mechanism for a member to unilaterally seek judicial dissolution of the entity, but not "dissociation" of another member. *See* N.C. Gen. Stat. § 57D-6-02. The Operating Agreement, to the extent it applies, contains a provision governing dissolution and allows for the withdrawal of a member or transfer of a member's interest by unanimous agreement of the members but does not include a method for ousting a member. Because Plaintiff seeks "dissociation" of Defendant rather than dissolution of the Companies, neither North Carolina law nor the Operating Agreement provide for that remedy.

Because, at this stage in the proceedings, the court cannot determine as a matter of law whether the Operating Agreement was effective during the relevant period, the court applies Vermont law, which allows an LLC member to seek another member's "dissociation." The court thus DENIES Defendant's motion to dismiss Count IV.

## H.    Whether the Complaint States a Claim for Misappropriation of Trade Secrets Under 18 U.S.C. § 1836 (Count V).

The DTSA "provides a private right of action for 'an owner of a trade secret that is misappropriated if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Zabit v. Brandometry, LLC*, 540 F. Supp. 3d 412, 419 (S.D.N.Y. 2021) (alterations adopted) (quoting 18 U.S.C. § 1836(b)(1)). The DTSA defines the "owner" of a trade secret as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed[.]" 18 U.S.C. § 1839.

In *Zabit*, the Southern District of New York rejected the plaintiffs' contention that equitable title belongs to "the person with control over the asset" and noted that "[t]he term is commonly used in intellectual property cases to describe expectant interests." 540 F. Supp. 3d at 420. The district court found that the creator of an index lacked standing to sue under the DTSA because the complaint alleged that the corporation, for which the creator served as CEO, was "the developer and exclusive owner of" the index. *Id.* at 419 (emphasis omitted). Defendant similarly contends that Plaintiff lacks standing to bring a claim under the Defense Trade Secrets Act ("DTSA") because Plaintiff "has not alleged

22

that Defendant used or misappropriated any trade secrets personally belonging to Plaintiff." (Doc. 12 at 7.) Plaintiff argues her DTSA claim is properly pled as a direct claim because she alleges "injuries that are separate and distinct from any suffered by the [Companies] themselves or by [Defendant]." (Doc. 19 at 15.)

The Complaint refers to "[t]he Companies' trade secrets" and does not allege that Plaintiff owned or had any expectant interest in those trade secrets. (Doc. 8 at 47, ¶ 232, 48 ¶ 236.) Nor does it allege that Plaintiff was a licensee. Plaintiff has therefore failed to plausibly plead standing under the DTSA. For that reason, the court GRANTS Defendant's motion to dismiss Count V.

## I.    Whether the Complaint States a Claim for Misappropriation of Trade Secrets Under 9 V.S.A. § 4601 (Count VI).

Unlike the DTSA, the Vermont Trade Secrets Act ("VTSA"), 9 V.S.A. § 4601, *et seq.*, does not "explicitly require[] ownership of a trade secret." *True Velocity Ammunitions, LLC v. Sig Sauer, Inc.*, 2024 WL 4583118, at *6 (D. Vt. Oct. 25, 2024). In cases predating the DTSA, "[t]he Second Circuit has consistently held . . . that possession of a trade secret is sufficient to confer standing on a party for a claim of trade secret misappropriation." *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 758 F. Supp. 2d 211, 220 (S.D.N.Y. 2010) (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999)).

Defendant asserts that, pursuant to the Operating Agreement, North Carolina, not Vermont, law governs allegations of trade secret misappropriation and the remedy under 9 V.S.A § 4601 is unavailable. Plaintiff maintains that Vermont law governs because the Companies are Vermont entities.

Viewing the facts alleged in the Complaint in the light most favorable to Plaintiff, it can reasonably be inferred that Plaintiff shared possession of the alleged trade secrets at issue, which include training materials, business strategies, customer lists, lead lists, and designer contacts. Because at this stage of the proceedings Vermont law applies and because the VTSA does not explicitly require claims to be brought by a trade secret's owner, the court DENIES Defendant's motion to dismiss Count VI.

### J.    Whether the Complaint States a Claim for Tortious Interference with Contractual Relations (Count VII).

Plaintiff alleges that Defendant tortiously interfered with her contractual relations with designers and employees by terminating designers' contractual relationships with the Companies and by helping employees find new jobs and evade their noncompete agreements. Defendant argues that these allegations fail to state a claim because "Plaintiff has not alleged that Defendant interfered with any contract or contractual relationship personally involving Plaintiff." (Doc. 12 at 8.)

The Vermont Supreme Court has adopted § 766 of the Restatement (Second) of Torts which provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

*Williams v. Chittenden Tr. Co.*, 484 A.2d 911, 913 (Vt. 1984) (quoting Restatement (Second) of Torts § 766). The tort requires Plaintiff to allege that Defendant "intentionally and improperly induced" the designers and employees not to perform contracts with Plaintiff. *Gifford v. Sun Data, Inc.*, 686 A.2d 472, 473 (Vt. 1996). It also requires Plaintiff to allege Defendant's interference was "wrongful or improper by some measure beyond the fact of interference itself[.]" *Kollar v. Martin*, 706 A.2d 945, 946 (Vt. 1997) (citations omitted). Defendant must, not only have "[k]nowledge of the existence of the contract" between Plaintiff and the designers and employees, *Williams*, 484 A.2d at 914, but Defendant's interference must also have resulted in Plaintiff's pecuniary loss. *See* Restatement (Second) of Contracts § 346(1) ("The injured party has a right to damages for any breach by a party against whom the contract is enforceable unless the claim for damages has been suspended or discharged."). Under Vermont law, Plaintiff falls short of plausibly alleging Defendant interfered in contracts *she* had with third parties. Instead, she alleges Defendant interfered with the *Companies'* contracts.

The North Carolina Supreme Court has similarly held that a claim for tortious interference with a contract requires:

> (1) a valid contract between the plaintiff and a third person which confers
> upon the plaintiff a contractual right against a third person; (2) the
> defendant knows of the contract; (3) the defendant intentionally induces the
> third person not to perform the contract; (4) and in doing so acts without
> justification; (5) resulting in actual damage to plaintiff.

*United Labs., Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988) (citing *Childress v.*

*Abeles*, 84 S.E.2d 176 (N.C. 1954)). The fifth element, "actual damage," refers to

monetary or pecuniary harm. *Burgess v. Busby*, 544 S.E.2d 4, 10 (N.C. Ct. App. 2001)

("[M]onetary damages or 'actual pecuniary harm' to plaintiffs . . . is a required element

of tortious interference with contract."). Interference with a contract is "justified if it is

motivated by a legitimate business purpose, as when the plaintiff and the defendant, an

outsider, are competitors." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 411 S.E.2d 916, 924

(N.C. 1992) (citation omitted).

 Under both Vermont and North Carolina law, there must be a valid contract

between Plaintiff and a third party as well as monetary damage suffered by Plaintiff

directly and proximately caused by the alleged interference. Plaintiff's Complaint instead

states that "[t]he *Companies* had a valid business relationship or expectancy" with the

designers and their employees. (Doc. 8 at 52 ¶¶ 260-61) (emphasis supplied). Because

Plaintiff has failed to plausibly plead the essential elements of a tortious interference with

contractual relations claim under both Vermont and North Carolina law, the court

GRANTS Defendant's motion to dismiss Count VII.

### K. Whether the Complaint States a Claim for Negligence (Count VIII).

 Defendant argues Plaintiff's negligence claim must be dismissed because Plaintiff

seeks purely economic losses. "The economic loss rule prohibits recovery in tort for

purely economic losses." *Long Trail House Condo. Ass'n v. Engelberth Const., Inc.*,

2012 VT 80, ¶ 10, 192 Vt. 322, 327, 59 A.3d 752, 755 (internal quotation marks and

citation omitted). As the Vermont Supreme Court has explained:

> In tort law, duties are imposed by law to protect the public from harm,
> whereas in contract the parties self-impose duties and protect themselves
> through bargaining. Thus, negligence actions are limited to those involving
> unanticipated physical injury, and claimants cannot seek, through tort law,
> to alleviate losses incurred pursuant to a contract.

*Id.* at ¶ 10, 192 Vt. at 327, 59 A.3d at 755 (citation omitted); *see also Walsh v. Cluba*, 2015 VT 2, ¶ 27, 198 Vt. 453, 466, 117 A.3d 798, 808 ("Tort law imposes duties to protect the public from harm, and thus negligence actions are generally limited to unanticipated physical injury, while contract law allows parties to protect themselves through bargaining.") (citation omitted).

Two primary concerns underpin the economic loss rule: (1) "economic losses proliferate more easily than losses of other kinds, leading to indeterminate and disproportionate liability[,]" and (2) "risks of economic loss tend to be especially well suited to allocation by contract." *Sutton v. Vt. Reg'l Ctr.*, 2019 VT 71A, ¶ 32, 212 Vt. 612, 628, 238 A.3d 608, 622 (alterations adopted) (internal quotation marks and citations omitted). Vermont law recognizes an exception to this rule whereby "[p]urely economic losses may be recoverable in professional services cases because the parties have a special relationship[.]" *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 31, 181 Vt. 513, 524, 928 A.2d 497, 507. The existence of a special relationship turns on whether "the nature of the relationship—most often a professional relationship such as doctor-patient or attorney-client—is such that it automatically triggers an independent duty of care that supports a tort action even when the parties have entered into a contractual relationship." *Walsh*, 2015 VT 2 at ¶ 30, 198 Vt. at 468, 117 A.3d at 809 (alterations adopted) (internal quotation marks and citation omitted); *see also Springfield Hydroelectric Co. v. Copp*, 779 A.2d 67, 71 (Vt. 2001) ("The underlying analysis turns on whether there is a duty of care *independent* of any contractual obligations.") (emphasis in original) (internal quotation marks and citation omitted).

"A special relationship requires a close relationship of trust, confidence, or reliance between the parties." *Veljovic v. TD Bank, N.A.*, 2025 VT 38, ¶ 13, 342 A.3d 941, 946. "Although a license may be indicative of this relationship, it is not determinative." *EBWS*, 2007 VT 37, ¶ 31, 181 Vt. at 525, 928 A.2d at 508. The

[f]acts that may support the establishment of a special relationship include:
(1) whether the defendant initiated a close relationship with the plaintiff;
(2) whether the defendant endorsed an action to members of the public generally or through personal solicitation and individualized relationships;

26

> and (3) whether the defendant targeted a narrow class of identified people
> who relied on the defendant's representations. . . . In addition, when
> analyzing the parties' relationship, the court may also consider whether the
> defendant promised exceptional oversight and management.

*PeakCM, LLC v. Mountainview Metal Sys., LLC*, 2025 VT 50, ¶ 35, 2025 WL 2423937,

at *8 (alteration adopted) (internal quotation marks and citations omitted).

Plaintiff does not claim any physical injuries but, rather, alleges she suffered
economic injuries and emotional distress as a result of Defendant's conduct. She
contends that the "special relationship" exception applies in her case because "Vermont
law imposes fiduciary duties by statutes on all LLC members, including . . . the duty of
care[]" which "in this context . . . is independent of any contract[.]" (Doc. 19 at 18-19.)
The Vermont Supreme Court, however, has applied the "special relationship" exception
in only one case. *PeakCM*, 2025 VT 50, ¶ 36, 2025 WL 2423937, at *8 ("Sutton v.
Vermont Regional Center is the sole case where this Court has held that a special
relationship existed sufficient for the exception to apply."). There, the Vermont Supreme
Court found a "special relationship" when the defendants "personally solicited" and then
"initiated a close relationship with [the] plaintiffs by recruiting them to invest their life
savings" in a series of development projects and "promis[ed] exceptional oversight and
management of the investment." *Sutton*, 2019 VT 71A ¶ 33, 212 Vt. at 628, 238 A.3d at
622.

In her Complaint, Plaintiff alleges she and Defendant are co-owners of the
Companies. Plaintiff has plausibly alleged under Vermont law that Defendant owed her
fiduciary duties, and a duty is "a prerequisite to recovery of economic damages in a
negligence case." *Long Trail House*, 2012 VT at ¶ 18, 192 Vt. at 330, 59 A.3d at 758; *see
also Veljovic*, 2025 VT 38, ¶ 19, 342 A.3d at 948 (holding that there was no special
relationship between an account holder and a bank "without a showing that [the account
holder] placed her trust, confidence, and reliance in the bank"). A duty, however, even a
fiduciary one, does not per se create a special relationship. Were that the case, there
would be a plethora of special relationship cases under Vermont law.

Even when drawing all reasonable inferences in Plaintiff's favor, Plaintiff has not

27

plausibly alleged that Defendant promised her exceptional oversight and management by going into business with her or any other facts that would give rise to a special relationship sufficient to create an exception to the economic loss rule. The court therefore GRANTS Defendant's motion to dismiss Count VIII.

### L.    Whether the Complaint States a Claim for Negligent Infliction of Emotional Distress (Count IX).

Under Vermont law, "[t]o establish a claim for negligent infliction of emotional distress, a plaintiff must make a threshold showing that he or someone close to him faced physical peril." *Zeno-Ethridge v. Comcast Corp.*, 2024 VT 16, ¶ 6, 219 Vt. 121, 126, 315 A.3d 978, 982 (quoting *Brueckner v. Norwich Univ.*, 730 A.2d 1086 (Vt. 1999)). "If there has been a[ physical] impact, the plaintiff may recover for emotional distress stemming from the incident during which the impact occurred." *Id.* (alteration adopted) (quoting *Brueckner*, 730 A.2d at 1092). A plaintiff who has not suffered a physical injury must establish that he or she was "within the 'zone of danger' of an act negligently directed at [plaintiff] by defendant," "was subjected to a reasonable fear of immediate personal injury," and "in fact suffered substantial bodily injury or illness as a result." *Id.* (quoting *Brueckner*, 730 A.2d at 1092).

Defendant argues that Plaintiff has not alleged either a physical impact or that she was within a zone of danger even though Plaintiff claims she has suffered "multiple forms of physical and psychological injuries resulting from [Defendant's] conduct." (Doc. 19 at 19.) The Complaint is devoid of allegations of a "physical impact" or threat of immediate personal injury, and Plaintiff's claim for NIED is instead based on Defendant's "constant intimidation, manipulation, lies, blame shifting[,] and gas lighting[.]" (Doc. 8 at 36, ¶ 185.) Consequently, Plaintiff has failed to state the essential elements of an NIED claim. *See Zeno-Ethridge*, 2024 VT 16, ¶ 8, 219 Vt. at 127, 315 A.3d at 983 ("When a party is not in a zone of danger, requiring a physical impact as part of an NIED claim is a 'well-established, and almost universally embraced' aspect of the common law.") (quoting *Vincent v. DeVries*, 2013 VT 34, ¶ 15, 193 Vt. 574, 581, 72 A.3d 886, 892).

28

Plaintiff's argument that the fiduciary relationship between her and Defendant obviates the physical impact requirement for a NIED claim does not alter that conclusion. This exception only "arises in circumstances with 'special relationships' or 'undertakings' that are inherently 'fraught with the risk of emotional harm and frequently involve an abuse of power or a position of authority.'" *Id.* at ¶ 18, 219 Vt. at 132, 315 A.3d at 986 (alterations adopted) (quoting *Vincent*, 2013 VT 34, ¶ 19, 193 Vt. at 583, 72 A.3d at 893). The Vermont Supreme Court has construed this exception narrowly, and has held the existence of a fiduciary duty between a plaintiff and defendant does not alone suffice for a NIED claim. *See Vincent*, 2013 VT 34, ¶ 25, 193 Vt. at 588, 72 A.3d at 897 (noting "modern trend of allowing damages under certain circumstances for serious emotional distress in legal malpractice," but finding trial court erred in awarding damages for plaintiff's emotional distress because the defendant's legal representation was not of a sufficiently "personal and emotional nature"). The court thus GRANTS Defendant's motion to dismiss Count IX.

## M.     Leave to Amend.

Pursuant to Fed. R. Civ. P. 15(a)(2), courts "should freely give leave" to amend a complaint "when justice so requires." However, "[l]eave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). Because, at this juncture, the court cannot find that the claims asserted by Plaintiff would be futile and because there is no other ground on which to deny leave to amend, Plaintiff is hereby GRANTED leave to amend within twenty (20) days of the date of this Opinion and Order consistent with the Federal Rules of Civil Procedure and this court's Local Rules.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Defendant's motion to dismiss (Doc. 12) and GRANTS Plaintiff leave to amend its Complaint within twenty (20) days of the date of this Opinion and Order consistent with the Federal Rules of Civil Procedure and this court's Local Rules.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 22nd day of December, 2025.

Christina Reiss, Chief Judge
United States District Court